[No. A123984. First Dist., Div. Five. Sept. 17, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
MARILYN SIBYL CHANDLER FENDERSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.D.–G.

**COUNSEL**

Paul F. DeMeester, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit, Catherine A. Rivlin and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BRUINIERS, J.**—Appellant Marilyn Sibyl Chandler Fenderson was a caregiver for Katherine Majerus, an elderly woman in failing health. After Majerus's death, Fenderson removed over $300,000 from Majerus's bank accounts, claiming that Majerus had given her the accounts. A jury convicted her of one count of grand theft (Pen. Code, § 487, subd. (a))[1] and one count of second degree commercial burglary (§§ 459, 460). On appeal, Fenderson contends that her convictions are not supported by substantial evidence and that the individual and cumulative impact of alleged instructional errors requires reversal. Fenderson also argues that recent amendments to section 4019 should be applied retroactively to entitle her to additional presentence custody credits.

In the unpublished portion of our opinion, we agree that the amendments to section 4019 are retroactive and that Fenderson is accordingly entitled to recalculation of her presentence custody credits. Otherwise, we affirm and specifically address in the published portion of our opinion three of Fenderson's contentions: the judgment was not supported by substantial evidence; the trial court failed to instruct the jury on certain probate code provisions; and improper limitations were placed on her claim-of-right defense.

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution's Case

Katherine Majerus died on January 22, 2006, at the age of 96. Fenderson had served as Majerus's caregiver.

Deirdre Kruse is an elder law attorney, with a practice in Santa Rosa. Kruse knew Majerus for approximately 23 years. Kruse met several of Majerus's care providers, one of whom was Fenderson. Kruse had prepared between six and eight wills for Majerus over the years. Kruse explained that "[Majerus] had no children and . . . she only had two elderly brothers and so she was very concerned about where her estate would go upon her death. [¶] . . . [¶] . . . [S]he had cats and a dog over the years and so always her bequest had something to do with nonprofit agencies that provided assistance for animals." Majerus never discussed naming Fenderson as a beneficiary. In fact, in all of the wills that Kruse prepared, Majerus had never made a bequest to an individual who was not a family member. In Majerus's 2004 will, Kruse was named as executor.

Majerus's 2004 will was prepared by Linda Barker Perkins, an associate attorney in Kruse's office. The 2004 will bequeathed $5,000 to one of Majerus's brothers, with the residue to be split by Guide Dogs for the Blind, Forgotten Felines, and Valley of the Moon Children's Home. No other individuals were named in the 2004 will. Fenderson's name was never mentioned to Barker Perkins in connection with the 2004 will.

On January 26, 2005, Majerus told Kruse "I don't trust [Fenderson,] . . . but I don't have anybody else." Kruse offered to help Majerus find a caregiver to replace Fenderson, but Majerus explained that she was fearful about starting over with someone else. Kruse and Majerus had similar conversations "[m]any times" over the years. In 2005, Majerus contacted Kruse regarding the sale of her home. After selling her home, Majerus moved into various assisted living facilities.

Kruse learned of Majerus's death when she saw her obituary in the paper. Both Kruse and Fenderson attended Majerus's funeral. At the funeral, Kruse asked Fenderson for Majerus's bank records, knowing that Fenderson had helped Majerus with her banking. In reply, Fenderson said that she would bring the documents "right over" to Kruse's office. Fenderson also asked if Majerus had changed her will. Kruse did not respond.

Kruse's office did not receive any documents from Fenderson until a month or two after the funeral. In March 2006, when Kruse received bank

records from Fenderson, Kruse only received records from a couple of small accounts at Washington Mutual. Kruse was concerned because her understanding was that the majority of Majerus's assets had been at Wells Fargo. Kruse had not received any records from Wells Fargo, where Kruse assumed the proceeds from the sale of Majerus's home had been placed.

On March 22, 2006, Kruse sent a letter to Wells Fargo notifying it of Majerus's death and requesting information on her bank accounts. Kruse did not receive any response. Concerned that a large sum of money derived from the sale of Majerus's house was unaccounted for, Kruse notified law enforcement.

Kim Nadeau worked as a paralegal in Kruse's office between October 2005 and July 2006. Beginning in February 2006, Nadeau tried to contact Fenderson eight times to obtain Majerus's bank records. Nadeau left a number of messages on Fenderson's answering machine. On February 27, 2006, Nadeau spoke with Fenderson after making two prior attempts. Fenderson explained that she was in the process of moving and was looking for the bank records. Fenderson told Nadeau that she would drop the records off the following week.

Ultimately, Nadeau received Washington Mutual bank records from Fenderson on March 27, 2006. Nadeau testified that she asked Fenderson about records from a Wells Fargo account. Fenderson indicated for the first time that "[Majerus] had given her that account and that's why she wasn't providing records for that account." Nadeau informed Kruse of Fenderson's statements and filed a police report.

Mark Fuston, a sergeant with the Sonoma County Sheriff's Office, testified that he was assigned to investigate after receiving a report from the Windsor Police Department regarding missing estate funds. Fuston contacted Kruse's office and interviewed Kruse and Nadeau. Fuston then obtained a court order for production of Majerus's financial records.

Majerus's Wells Fargo records show that the proceeds from the sale of her home were deposited into her checking account on February 10, 2005. The records also show that $259,000 was withdrawn from the same checking account on April 7, 2006, after Majerus's death. Fuston also obtained a copy of a Wells Fargo Bank preprinted special power of attorney form, signed by Majerus on June 30, 2005, that gave Fenderson access to Majerus's Wells Fargo accounts.

Fuston was not successful in contacting Fenderson, despite making telephonic requests. On September 19, 2007, Fuston met with a Wells Fargo

employee who provided Fuston with a copy of a cashier's check. The cashier's check was dated April 7, 2006, and was made payable to Fenderson in the amount of $304,000. A Wells Fargo withdrawal slip, signed in Fenderson's name, shows a withdrawal of $45,000 from a Wells Fargo savings account on April 7, 2006.

Next, Fuston searched Sonoma County property records and learned that Fenderson had purchased a home in Larkfield on November 17, 2006. A downpayment of $184,258.50 had been paid by Fenderson to Chicago Title Company. The check was drawn from Citibank. Two other checks to Chicago Title had been drawn from Fenderson's Citibank account.

Fenderson was arrested on October 5, 2007. After having been read her *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) rights, Fenderson told Fuston that she had been taking care of Majerus for quite a few years and that Majerus had given her permission to take the proceeds from the sale of her home. Fenderson told Fuston that she purchased the house in Larkfield with the money and also used it to purchase clothing and groceries and to help one of her daughters.

Robert Dortch, a senior investigator with Citigroup's investigative services, testified regarding Fenderson's Citibank account records. On April 7, 2006, Fenderson's account showed a $304,000 deposit. In addition, Fenderson's account records showed the following transactions: withdrawals of $8,341.58 for April 2006; deposits of $883.51 and withdrawals of $20,370.61 for May 2006; deposits of $824.43 and withdrawals of $8,143.91 for June 2006; deposits of $1,048.92 and withdrawals of $14,050.87 for July 2006; deposits of $418.34 and withdrawals of $9,659.24 for August 2006; deposits of $397.91 and withdrawals of $15,948.97 for September 2006; deposits of $446.15 and withdrawals of $6,677.59 for October 2006; and deposits of $216.07 and withdrawals of $198,922.39 for November 2006.

### Defense Case

Fenderson testified that, in 1996, she became licensed as a certified nursing assistant, home health assistant, acute care assistant, and phlebotomist. Fenderson met Majerus that same year. Fenderson began working with Majerus between two and six hours per week. Fenderson would come to Majerus's home and take Majerus shopping or drive her to medical appointments. In total, Fenderson worked with Majerus for 10 years before her death. Fenderson also socialized with Majerus. They celebrated birthdays and holidays together, and Majerus grew to know Fenderson's daughters.

Fenderson testified that Majerus lived at home when Fenderson first began working for her. Majerus sold the house in 2005 when "she wasn't able to

keep it up anymore." Thereafter, Majerus moved into a hospital, when she had pneumonia, and then into Deer Creek Manor, a residential care home. Fenderson visited Majerus every day while she was in the hospital and worked two to three hours most days while Majerus was at Deer Creek Manor. Fenderson would write out checks for Majerus's bills and take her shopping or to the park.

Fenderson testified that, in November 2004, Majerus said that "when she passed away, . . . everything that was in her Wells Fargo accounts" was Fenderson's. Fenderson believed Majerus, stating "I had no reason not to. She'd never lied to me before." Months later, on June 30, 2005, Majerus gave Fenderson power of attorney over Majerus's three Wells Fargo accounts. Fenderson did not read the power of attorney, but understood that "[Majerus] was putting [her] on the account[s] so [she] could take care of [Majerus's] business when [Majerus] wasn't able to."

In April 2005, Majerus fell and broke her back and moved to Dolly's Manor, a facility that could provide more extensive care. Majerus resided at Dolly's Manor until her death. Fenderson continued to work for her a couple of hours a day.

Fenderson was notified of Majerus's death by Dolly's Manor. Fenderson attended Majerus's funeral, along with Kruse, whom Fenderson had known since the 1980's. At the funeral, Kruse asked Fenderson for Majerus's bills and financial records. Fenderson agreed to provide them. They did not discuss Majerus's Wells Fargo accounts.

On cross-examination, Fenderson conceded that she had never seen a will in which Majerus named her as a beneficiary. She knew that Kruse was the attorney who had prepared Majerus's will. Fenderson was never contacted by Kruse and told that she was a beneficiary of Majerus's will. However, Fenderson testified that she did not ask Kruse if Majerus had changed her will.

Fenderson recalled discussions with Nadeau regarding Majerus's financial records. In approximately February or March 2006, Fenderson told Nadeau that Majerus had left her the Wells Fargo accounts. At the end of March 2006, Fenderson provided Kruse's office with some of Majerus's financial documents. Fenderson did not provide any of Majerus's Wells Fargo documents because she believed the money was her own.

Fenderson testified that, on April 7, 2006, she went into a Wells Fargo bank and withdrew $259,000 from Majerus's checking account and $45,000 from Majerus's savings account. Fenderson was asked: "And you did that based

upon your position as power of attorney. Is that correct?" Fenderson replied: "No. [¶] . . . [¶] At that point I was not the power of attorney." Fenderson did not inform Wells Fargo that Majerus had died, believing that her attorney had done so. Fenderson deposited the $304,000 into her Citibank account the same day. Fenderson spent the money in various ways, including purchasing a home in Larkfield.

Donald Oliver and his wife owned and administered Deer Creek Manor. Oliver testified that Majerus lived at Deer Creek Manor between November 9, 2004, and April 1, 2005. According to Oliver, Fenderson visited Majerus four or five days a week and provided services that Deer Creek Manor did not provide. Majerus never complained to Oliver about Fenderson. One day, Oliver overheard Majerus tell Fenderson " 'When I pass away . . . I'd like you to have the rest of what is left in this account.' " Oliver did not know to which account Majerus was referring. Oliver testified that he had seen Fenderson after Majerus left the facility and had discussed the fact that Fenderson was experiencing legal problems.

Fenderson was charged by information with grand theft (§ 487, subd. (a); count one) of $259,000 from Majerus's estate and commercial burglary (§ 459; count two). With respect to the first count, it was further alleged that Fenderson took property of a value exceeding $150,000. (Former § 12022.6, subd. (a)(2), as amended by Stats. 1998, ch. 454, § 2, p. 3231.) Fenderson was tried by jury and convicted on both counts. The enhancement allegation was also found true.

On December 18, 2008, Fenderson was sentenced to state prison for a total term of four years. Fenderson was sentenced to a two-year term on count one. A two-year term on count two was stayed, pursuant to section 654. Fenderson also received a two-year term for the enhancement. The court ordered restitution, in the amount of $304,000, to be paid to the victims and a restitution fine of $600. Fenderson received a total of 36 days of presentence custody credit. Fenderson, acting pro se, filed a timely notice of appeal.

## II. DISCUSSION

In her opening brief, Fenderson contends that (1) her convictions are not supported by substantial evidence; (2) the court's failure to instruct on certain probate code provisions requires reversal; (3) the claim-of-right defense was improperly limited; (4) the jury was improperly instructed regarding consciousness of guilt; (5) the jury was improperly instructed that any failure to explain adverse testimony could be considered in evaluating the evidence; and (6) the cumulative effect of these errors requires reversal. In her supplemental opening brief, Fenderson further contends that the recent

amendments to section 4019 should be applied retroactively to entitle her to additional presentence custody credits. We address each of these arguments in order.

## A. *Substantial Evidence*

Fenderson argues for the first time on appeal that, as a matter of law, the June 30, 2005 power of attorney remained in effect on April 7, 2006, entitling Fenderson to make the subject withdrawals. Accordingly, she argues that substantial evidence does not support the trespassory elements of grand theft and burglary necessary to sustain her conviction for these offenses.

In determining the sufficiency of the evidence, we " 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577 [162 Cal.Rptr. 431, 606 P.2d 738].) "Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' [Citations.]" (*Id.* at p. 576.)

### 1. *The Power of Attorney*

Generally, a power of attorney terminates on the death of the principal. (Prob. Code, § 4152, subd. (a)(4) ["the authority of an attorney-in-fact under a power of attorney is terminated by . . . [¶] . . . [¶] (4) Death of the principal . . ."].) However, Fenderson points out that section 4101, subdivision (a), of the Probate Code provides, in relevant part: "the principal may limit the application of any provision of this division by an express statement in the power of attorney or by providing an inconsistent rule in the power of attorney." Here, the power of attorney states in relevant part: "This power of attorney will remain in effect until *this office* of Wells Fargo receives actual notice of my death, or the accounts are closed, or this office receives from me written revocation of this power of attorney and has provided me with written acknowledgement of such revocation."[2] (Italics added.) Fenderson argues that the power of attorney was still in effect on April 7, 2006, because Kruse "had notified a different bank branch of her client's death, but not the branch where the power of attorney was lodged."[3]

---

[2] The special power of attorney was, as noted above, a preprinted Wells Fargo Bank form. The requirement of notice to the branch where the accounts were located seems self-evidently intended to protect the bank and not the account holder.

[3] Fenderson also relies on Probate Code section 4308, which provides: "(a) A third person who conducts activities through employees is not charged under this chapter with actual knowledge of any fact relating to a power of attorney, nor of a change in the authority of an attorney-in-fact, unless both of the following requirements are satisfied: [¶] (1) The information

In considering Fenderson's arguments we therefore assume that she held an operative power of attorney at the time that she removed funds from those accounts on April 7, 2006.[4] Unfortunately for Fenderson, this fact fails to aid her position.

### 2. Fenderson Was Properly Convicted of Grand Theft

#### a. Grand Theft by Larceny

■ Section 487, subdivision (a), provides: "Grand theft is theft committed . . . [¶] (a) When the money, labor, or real or personal property taken is of a value exceeding four hundred dollars ($400) . . . ." "Theft" is defined in section 484, subdivision (a), as follows: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft. . . ." Burglary "requires an entry into a specified structure with the intent to commit theft or any felony. [Citations.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 170–171 [64 Cal.Rptr.3d 163, 164 P.3d 590].)

■ "Since the amendment in 1927 to section 484 . . . , an accused may be convicted of grand theft upon proof showing either larceny, embezzlement or obtaining money by false pretenses [citation], and it is unnecessary to specify in the accusatory pleading the kind of grand theft with which the defendant is charged." (*People v. Martin* (1957) 153 Cal.App.2d 275, 281 [314 P.2d 493]; accord, § 952; *People v. Creath* (1995) 31 Cal.App.4th 312, 318 [37 Cal.Rptr.2d 336].)

Contrary to Fenderson's suggestion, the information here did not charge that the theft had been committed in any specific manner. However, the jury

---

is received at a home office or a place where there is an employee with responsibility to act on the information. [¶] (2) The employee has a reasonable time in which to act on the information using the procedure and facilities that are available to the third person in the regular course of its operations. [¶] (b) *Knowledge of an employee in one branch or office of an entity that conducts business through branches or multiple offices is not attributable to an employee in another branch or office.*" (Italics added.)

[4] There is evidence that Fenderson withdrew the $304,000 from a Wells Fargo branch on Fourth Street in Santa Rosa and that Kruse notified a Wells Fargo branch on B Street in Santa Rosa of Majerus's death. However, there is no evidence in the record demonstrating where the power of attorney was lodged.

was only instructed on theft by larceny. The burglary instruction also incorporated the theft by larceny instructions.

"The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away. [Citations.] The act of taking personal property from the possession of another is always a trespass unless the owner consents to the taking freely and unconditionally or the taker has a legal right to take the property. [Citation.]" (*People v. Davis* (1998) 19 Cal.4th 301, 305 [79 Cal.Rptr.2d 295, 965 P.2d 1165], fns. omitted.)

Fenderson contends in essence that there was no evidence to satisfy the trespass element of theft by larceny. At trial, she contended that she became the owner of the account by virtue of an oral bequest from Majerus, effective upon Majerus's death. She argued that she could not be guilty of grand theft because she took the funds under a good faith claim of right, believing that Majerus had given them to her. She did not, however, claim any belief that the power of attorney gave her the right to funds in the account, testifying that "[Majerus] was putting [her] on the account[s] so [she] could take care of [Majerus's] business when [Majerus] wasn't able to." When asked if she withdrew funds from the Wells Fargo accounts "based upon [her] position as power of attorney," she replied: "No. [¶] . . . [¶] At that point I was not the power of attorney."

She now contends that continuing validity of the power of attorney establishes that she necessarily took the property with the consent of the "owner's agent"—herself. Fenderson asserts that, because she remained Majerus's agent pursuant to the power of attorney, the taking was obviously under an agent's authority, even if she may have been guilty of embezzlement by later converting the funds to her own use.[5] The People concede that if Fenderson obtained the money through a valid power of attorney she would be guilty of theft by embezzlement, rather than theft by larceny. We think the People concede too much.

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been [e]ntrusted." (§ 503.) The elements of embezzlement are "1. An owner entrusted his/her property to the defendant; 2. The owner did so because he/she trusted the defendant; 3. The defendant fraudulently converted that property for his/her own benefit; [and] 4. When the defendant converted the property, he/she intended to deprive the owner of its use." (CALCRIM

---

[5] Her opening brief refers euphemistically to "shirk[ing] her fiduciary responsibilities as an attorney-in-fact" and says that she "may have committed embezzlement."

No. 1806.) Fenderson in fact concedes that the evidence is sufficient to establish embezzlement, but argues that the jury was never instructed on a theory of theft by embezzlement.

■ We agree that Fenderson's crime would have been embezzlement had it occurred while Majerus was alive. However, even if she held a power of attorney still recognized by the bank in April 2006, this does not mean as Fenderson contends, that she was entrusted with the funds in the Wells Fargo accounts by their *owner* at the time that she took them. Fenderson acknowledged that she acquired no ownership interest in the accounts under the power of attorney, but held authority over the accounts only as *Majerus's* agent. Fenderson's argument presumes that Majerus remained the owner of the funds in the Wells Fargo accounts on April 7, 2006. She did not. Majerus died on January 22, 2006. On April 7, 2006, the owner of the account was Majerus's estate. Subject to administration, "title to a decedent's property passes *on the decedent's death* to the person to whom it is devised in the decedent's last will or, in the absence of such a devise, to the decedent's heirs as prescribed in the laws governing intestate succession." (Prob. Code, § 7000, italics added; see *id.*, § 7001.) Fenderson was charged with theft from the estate, not from Majerus. Fenderson does not contend that the beneficiaries of Majerus's will consented to Fenderson's taking, or that she was *their* agent, and the jury obviously rejected her testimony that she made the withdrawals believing that Majerus had given the accounts to her. Fenderson may have had the ability to access the Wells Fargo accounts in April 2006, but she had no authority from the owner to do so. Thus, substantial evidence supports Fenderson's convictions for a trespassory taking of the property of the estate, i.e., grand theft by larceny.

b. *Grand Theft by Embezzlement*

We agree in any event with the People that, whether or not larceny was the proper theory of theft in this instance, Fenderson's convictions may nonetheless be affirmed even if based on substantial evidence of theft by embezzlement. As discussed *post*, Fenderson essentially concedes the sufficiency of the evidence to establish embezzlement.

■ In *People v. North* (1982) 131 Cal.App.3d 112, 117–118 [182 Cal.Rptr. 126] (*North*), the Second District Court of Appeal held that a theft conviction may be upheld as long as there is sufficient evidence, under any theory of theft, to support the conviction, even if the jury was not instructed on the relevant theory of theft. "Over [the defendant's] objection, the jury was instructed on larceny by trick or device even though obtaining property by false pretenses is a more accurate description of the crime committed. [¶] The necessity of corroboration distinguishes false pretenses from trick and device

and adds to the burden of proof the People must carry. Corroboration was present at bench . . . . In *People* v. *Kagan* (1968) 264 Cal.App.2d 648 [70 Cal.Rptr. 732] . . . the jury was instructed on larceny by trick and device, embezzlement and false pretenses. The court, discussing the distinction between said types of theft said at page 658: 'As to the California theft statute (§ 484), however, the cases all hold that a judgment of conviction must be affirmed if there is sufficient evidence to support a theft conviction on *any* theory. [Citations.] As stated in [*People v.*] *Ashley* [(1954) 42 Cal.2d 246, 258 [267 P.2d 271]], "Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved." ' (Fn. omitted.)" (*North, supra*, 131 Cal.App.3d at pp. 117–118.)

Our own division has adopted the reasoning of *North*. (*People v. Counts* (1995) 31 Cal.App.4th 785, 792 [37 Cal.Rptr.2d 425] (*Counts*).) In *Counts*, codefendant Mikels ordered lumber on credit for a project that did not exist and then sold the lumber at a discount to Counts. Mikels was convicted of three counts of grand theft and one count of attempted theft. (*Counts, supra*, 31 Cal.App.4th at pp. 787–788.) On appeal, Mikels argued that one of the counts of grand theft should be reversed because the lumber company retained a security interest in the lumber, which negated the element of transfer of title required to prove theft by false pretenses. Mikels claimed he could be convicted only of larceny by trick, a theory on which the jury had not been instructed. (*Id.* at pp. 788, 792.)

■ The court observed that "[i]n California, the ancient common law distinctions between the theories of larceny by trick and theft by false pretenses no longer exist by statute; under section 484, there is simply one consolidated crime of theft, which the jury may find upon either theory, if there is an 'unlawful[ taking]' [citation]." (*Counts, supra*, 31 Cal.App.4th at p. 793.) " 'The purpose of the consolidation [in section 952][6] was to remove the technicalities that existed in the pleading and proof of these crimes at common law. . . .' " (*Counts*, at p. 793, quoting *People v. Ashley, supra*, 42 Cal.2d at p. 258.)

Mikels relied on *People v. Curtin* (1994) 22 Cal.App.4th 528, 531 [27 Cal.Rptr.2d 369] (*Curtin*), in which Division Three of this court stated that "the offense shown by the evidence must be one on which the jury was instructed and thus could have reached its verdict." (See *Counts, supra*, 31 Cal.App.4th at pp. 791–792.) Mikels argued that, under *Curtin*, reversal of a theft conviction is always required if the defendant is found guilty of theft on the wrong theory.

---

[6] Section 952 states in relevant part that "[i]n charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another."

In *Curtin* the defendant was convicted of second degree burglary, grand theft, and forgery "arising out of a single incident in which he cashed a check at a bank by misrepresenting himself as one of the bank's depositors and using a forged signature." (*Curtin, supra,* 22 Cal.App.4th at p. 530.) The jury was instructed on only one theory of theft, theft by trick and device, requiring "that in surrendering possession of the property, the victim of the theft 'did not intend to transfer the ownership.'" The defendant argued, and the court agreed, that there was no evidence to satisfy this element of the offense. (*Id.* at p. 531.) Reversing, the *Curtin* court held that "if the elements of theft by trick were not proven, the conviction cannot be affirmed on the ground the evidence showed defendant's guilt of false pretenses, which has additional required substantive elements, as well as a special corroboration requirement, upon which the jury was not instructed [citation]." (*Ibid.*)

*Counts* distinguished *Curtin,* noting that in *Curtin* "the instruction as to larceny by trick required the presence of evidence which did not exist in the record, and there was insufficient evidence of corroboration to sustain the conviction on a theory of false pretenses. [Citation.]" (*Counts, supra,* 31 Cal.App.4th at p. 791.) *Counts* criticized the statement in *Curtin* that "the offense shown by the evidence must be one on which the jury was instructed and thus could have reached its verdict" (*Curtin, supra,* 22 Cal.App.4th at p. 531) as dictum, and observed that "neither *Curtin* nor any decision cited therein actually holds there is a rule of per se reversal in such circumstances." (*Counts,* at pp. 791–792.)

*Counts* found any error harmless, since "even under [the] appellant's theory, the error caused the People to carry an unnecessary burden of proving corroboration in order to establish false pretenses. It is impossible to understand how an error which increased the People's evidentiary burden could have prejudiced appellant." (*Counts, supra,* 31 Cal.App.4th at p. 793.) As the court observed, "[i]t would obviously be very hard to explain why a theft conviction should be reversed on the grounds that the evidence showed the defendant was indeed guilty of theft, but would have been guilty of a differently denominated type of theft under a common law system which has been repealed by statute. In the words of Justice Traynor, 'it is immaterial whether or not [the jurors] agreed as to the technical pigeonhole into which the theft fell.' [Citation.]" (*Id.* at pp. 793–794.)

Similarly, in *People v. Traster* (2003) 111 Cal.App.4th 1377 [4 Cal.Rptr.3d 680], the Second District Court of Appeal affirmed a conviction where the jury was instructed on theft by false pretenses, when theft by trick was the appropriate theory. The reviewing court observed that the error "is merely a technical one in which the jury was instructed on a particular theory of theft which turned out to be the wrong one. In these circumstances, the instructional error is harmless. This is particularly so in this case where the

instructional error 'caused the People to carry the unnecessary burden of proving [the additional element] of corroboration in order to establish false pretenses.' " (*Id.* at pp. 1389–1390, fns. omitted.)

We acknowledge that the Third District Court of Appeal, in *People v. Beaver* (2010) 186 Cal.App.4th 107 [111 Cal.Rptr.3d 726] (*Beaver*), recently followed *Curtin* in a similar situation. In *Beaver*, the defendant was convicted of grand theft after he staged an accident at the ski resort where he worked to obtain medical treatment for a prior injury to his knee and to collect a cash settlement. (*Id.* at pp. 110–111.) The jury was instructed on theft by larceny. (*Id.* at p. 119.) The defendant argued, on appeal, that a larceny instruction was not appropriate because the evidence showed only theft by false pretenses. (*Id.* at pp. 119–120.) Accordingly, he argued that the jury was permitted to convict him by finding he intended to deprive his employer of property, but without also finding that he intended to take possession of the property in the first place or that his employer relied on his representations or pretenses, which are elements of theft by false pretenses. (*Id.* at p. 120.)

The Third District Court of Appeal agreed that, because the defendant's employer willingly paid for his medical treatment on the false representation that it had caused his injuries, theft by false pretenses was the appropriate offense. (*Beaver, supra,* 186 Cal.App.4th at p. 121.) Relying on *Curtin,* the court also rejected the People's argument that "the consolidation of all theft offenses into the single crime of theft in section 484 means the precise theory utilized by the prosecution does not matter as long as the evidence supports the elements of at least one of the consolidated offenses." (*Id.* at pp. 122–123.) The court noted that the discussion of *Curtin* in *Counts* was itself dictum. It also distinguished *Counts,* observing that the elements of theft by trick are subsumed within the elements of theft by false pretenses but that the elements of theft by false pretenses are not subsumed within the elements of theft by larceny. Because the instructions read to the jury did not include all the elements necessary for theft by false pretenses, the failure to instruct on those elements violated the defendant's constitutional rights to have the charges decided by a jury even if there was sufficient evidence in the record to support such a charge. (*Id.* at pp. 124–125.) The error could not be deemed harmless because "even if there was evidence in the record to support [the elements of theft by false pretenses], the jury was never called upon to determine if they had been established beyond a reasonable doubt." (*Id.* at p. 125.)

■ We nevertheless find any error in the theory of grand theft presented to the jury to be harmless here. Pursuant to CALCRIM No. 1800, the jury was told that to find Fenderson guilty of grand theft, the prosecution was required to prove the following: "1. The defendant took possession of

property owned by someone else; 2. The defendant took the property without the owner's or owner's agent's consent; 3. When the defendant took the property she intended to deprive the owner of it permanently; AND 4. The defendant moved the property, even a small distance, and kept it for any period of time, however brief." As discussed *ante*, the instruction was correct on the facts of this case. But even if embezzlement were the correct theory of theft to pursue, we would find any error harmless. Embezzlement is theft (§ 490a)[7] and is chargeable as theft. (*People v. Artis* (1993) 20 Cal.App.4th 1024, 1027 [25 Cal.Rptr.2d 63].) "[T]here are no conflicts between the elements to prove, or the punishment for, embezzlement under section 484 and embezzlement defined in section 507. Each is punished 'in the manner prescribed for theft of property of the value or kind embezzled.' (§ 514.)" (*People v. Artis*, at p. 1027.) As with larceny by trick and obtaining property by false pretenses, embezzlement and grand theft by larceny are "aimed at different criminal acquisitive techniques . . . [but,] with other larcenous crimes, have been consolidated into the single crime of theft (. . . § 484) . . . ." (*People v. Ashley, supra*, 42 Cal.2d at p. 258.)

■ As Fenderson herself concedes, grand theft by larceny requires proof of a trespassory taking, and embezzlement does not. Even if we assume that Fenderson lawfully acquired possession of money from the accounts under the authority of a valid power of attorney, substantial evidence establishes that Fenderson immediately deposited the money in her own bank account and immediately diverted it for personal purposes not permitted or contemplated by the power of attorney, which she acknowledged allowed her only to take care of Majerus's business when Majerus was unable to do so. Taking money from Majerus's accounts for Fenderson's own purposes would have been theft while Majerus was alive, and was theft from her estate, whatever her "criminal acquisitive technique[]." (*People v. Ashley, supra*, 42 Cal.2d at p. 258.) Thus, there is substantial evidence in the record to support a theory of theft by embezzlement. The evidence further supports the inference that Fenderson had the intent to appropriate the money from the Wells Fargo accounts for her own purposes when she entered the Wells Fargo branch to withdraw the funds, providing substantial evidence to support the burglary conviction. We agree with *Counts* that "It is impossible to understand how an error which increased the People's evidentiary burden could have prejudiced appellant." (*Counts, supra*, 31 Cal.App.4th at p. 793.) ■ We also agree that "[i]t would obviously be very hard to explain why a theft conviction should be reversed on the grounds that the evidence showed the defendant was indeed guilty of theft, but would have been guilty of a differently

---

[7] "Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall hereafter be read and interpreted as if the word 'theft' were substituted therefor." (§ 490a.)

denominated type of theft under a common law system which has been repealed by statute." (*Ibid.*)

## B. *Failure to Instruct on Probate Code Sections*

Fenderson suggests that her convictions must be reversed because the jury was not instructed on Probate Code section 4101 or 4308.[8] "Errors in jury instructions are questions of law, which we review de novo." (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424 [51 Cal.Rptr.3d 263].) An appellate court cannot set aside a judgment on the basis of instructional error unless, after an examination of the entire record, the court concludes that the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)

Specifically, Fenderson asserts: "Although the Probate Code provides that explicit terms of a power of attorney document may vary from and be inconsistent with the terms that are statutorily prescribed, the jury was not instructed on these principles, and was therefore not in a position to find that [Fenderson] was within her power of attorney rights in withdrawing the moneys on April 7, 2006, which may have led to [Fenderson's] acquittal."

The first difficulty with Fenderson's argument is that she requested no such instructions in the trial court and made no objection when the jury was instructed that "[a] power of attorney terminates upon the death of the principal . . . ." But, even assuming that the trial court had a sua sponte duty to instruct on Probate Code sections 4101 and 4308, this argument fails for the same reason that Fenderson's first argument fails. Even if the power of attorney remained valid on April 7, 2006, there was no evidence that Fenderson obtained possession of the funds with the required consent from the beneficiaries of Majerus's will. Thus, the trial court did not err by not instructing on Probate Code section 4101 or 4308.

## C. *Claim-of-right Instruction*

■ Next, Fenderson argues that the trial court erred in its instructions to the jury on the claim-of-right defense. "The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a

---

[8] Probate Code section 4101, subdivision (a) states that "[e]xcept as provided in subdivision (b), the principal may limit the application of any provision of this division by an express statement in the power of attorney or by providing an inconsistent rule in the power of attorney." Probate Code section 4308, subdivision (b) provides that "[k]nowledge of an employee in one branch or office of an entity that conducts business through branches or multiple offices is not attributable to an employee in another branch or office."

right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery. At common law, a claim of right was recognized as a defense to larceny because it was deemed to negate the *animus furandi*, or intent to steal, of that offense. [Citation.]" (*People v. Tufunga* (1999) 21 Cal.4th 935, 938 [90 Cal.Rptr.2d 143, 987 P.2d 168] (*Tufunga*).)

Specifically, Fenderson maintains that the trial court erred by using CALCRIM No. 1863, to instruct as follows: "If the defendant obtained property under a claim of right, she did not have the intent required for the crime of theft. [¶] The defendant obtained property under a claim of right if she believed in good faith that she had a right to the specific property or a specific amount of money, and she openly took it. [¶] In deciding whether the defendant believed that she had a right to the property and whether she held that belief in good faith, consider all the facts known to her at the time she obtained the property, along with all the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not in good faith. [¶] *The claim-of-right defense does not apply if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered.* [¶] The claim-of-right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal. [¶] If you have a reasonable doubt about whether the defendant had the intent required for theft, you must find her not guilty of grand theft." (Italics added.)

Fenderson argues that inclusion of the italicized language constituted prejudicial error because concealment is only relevant in embezzlement cases.[9] Fenderson relies on section 511, which provides: "Upon any indictment for *embezzlement*, it is a sufficient defense that the property was appropriated *openly and avowedly*, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him." (Italics added.)

---

[9] Fenderson's trial counsel objected to this language, albeit for a different reason. At trial, defense counsel stated, "in light of the testimony, it would appear that there was no concealment." The trial court overruled the objection and Fenderson now concedes that the record contains evidence of concealment. We nonetheless review her new claim on the merits, as well as the asserted instructional errors raised in the unpublished portions of the opinion, because section 1259 permits us "[to] review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

■ Fenderson's argument is without merit. Our Supreme Court has rejected the argument that section 511 does not apply to theft by means other than embezzlement. (*Tufunga, supra*, 21 Cal.4th at p. 952, fn. 4.)[10] In *Tufunga*, the court noted: "Arguably, the Legislature in 1927 expanded the statutory basis of the claim-of-right defense for embezzlement to all theft-related offenses when it enacted section 490a, which provides, 'Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall hereafter be read and interpreted as if the word "theft" were substituted therefor.' [Citations.] Consequently, section 511 may be read as providing a statutory claim-of-right defense to all theft-related charges, as broadened from embezzlement through the provisions of section 490a." (*Tufunga, supra*, 21 Cal.4th at pp. 952–953, fn. 4; see also *People v. Russell, supra*, 144 Cal.App.4th at p. 1428; *People v. Romo* (1990) 220 Cal.App.3d 514, 518–519 [269 Cal.Rptr. 440]; *People v. Holmes* (1970) 5 Cal.App.3d 21, 25 [84 Cal.Rptr. 889].)

Furthermore, Fenderson does not suggest any good reason why the claim-of-right defense should apply to theft by larceny despite evidence of concealment, but not to theft by embezzlement. A lack of concealment is evidence that a defendant has a good faith belief in his or her right to the property at issue. (See *People v. Stewart* (1976) 16 Cal.3d 133, 141 [127 Cal.Rptr. 117, 544 P.2d 1317] [embezzlement case].) Thus, concealment (or absence of concealment) is relevant when a claim-of-right defense is raised in connection with theft by whatever means. The trial court did not err.

D.–G.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## III. DISPOSITION

The judgment is reversed as to the calculation of presentence custody credits only. On remand, the trial court shall revise its sentencing order and the abstract of judgment to reflect that Fenderson earned a total of 24 days of

---

[10] In *Tufunga*, the court held that the claim-of-right defense does not apply to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated—as opposed to forcible takings intended to recover specific personal property in which the defendant in good faith believes he has a bona fide claim of ownership or title . . . ." (*Tufunga, supra*, 21 Cal.4th at p. 956.)

*See footnote, *ante*, page 625.

presentence conduct credits pursuant to section 4019, for a total presentence credit of 48 days. The court shall forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

Jones, P. J., and Needham, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 21, 2010, S187649. George, C. J., and Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.