Filed 10/16/13  P. v. Martinez CA2/6
Opinion following recall of remittitur

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE SANDOVAL MARTINEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B232880<br>(Super. Ct. No. 2009019981)<br>(Ventura County)<br><br>OPINION FOLLOWING RECALL<br>OF REMITTITUR[1] |

Enrique Sandoval Martinez appeals from the judgment following his conviction by jury of making false financial statements (Pen. Code, § 532a, subd. (1));[2] grand theft (§ 487, subd. (a)); money laundering (§ 186.10, subd. (a)); and three counts of offering a false instrument for recording (§ 115, subd. (a)).  The jury also found true allegations of aggravated white collar crime, excess taking, and excessive transaction values.  (§§ 186.11, subd. (a)(3)), 12022.6, subd. (a)(2), 186.10, subd. (c)(1)(C).)  The trial court sentenced appellant to 15 years in prison.[3]  Appellant contends that there is not

---

[1] On October 2, 2013, the Supreme Court granted petitioner's request for review and remanded the matter to this court with directions to recall the remittitur issued by this court on June 18, 2013, and "to refile" our opinion in this case.

[2] All statutory references are to the Penal Code unless otherwise stated.

[3] His sentence includes the following consecutive terms and enhancements:  an upper three-year term for making false financial statements, with two-year excess taking and five-year aggravated white collar crime enhancements; an eight-month term for theft, with an eight-month excess taking enhancement; an eight-month term for money

sufficient evidence to support his theft conviction and the accompanying excess taking enhancement; and the trial court erred by admitting evidence that he used different names in his two immigration applications, and by instructing the jury with a "false theory of guilt" for making false financial statements. He further contends that the court violated section 654 by failing to stay the execution of his sentences for two counts of offering false documents for recording. We affirm.

BACKGROUND

*The Palmer Property and Related Real Estate Transactions*

In 2004, Sharon Jachec worked as a real estate agent for Toll Brothers, the builder of a residential development in Moorpark, to discuss the purchase of a home in the development. Real estate agent Cheri Tucker and appellant met with Jachec in September 2004. Appellant selected a lot and floor plan, gave Jachec a deposit, and completed a questionnaire, using the name Antonio Padilla.

On October 26, 2004, appellant, using the name Padilla, signed an agreement to buy a residence at 12216 Palmer Drive in Moorpark (the Palmer property) for $1,775,275. The agreement required appellant to pay $409,840 to complete the sale, including earlier deposits that totaled $40,000.

In October 2005, with the assistance of Tucker Mortgage (a company owned by Cheri, and her husband, Terry Tucker), appellant, as Padilla, applied to borrow $1,366,168 from Washington Mutual (WAMU)[4] to purchase the Palmer property. Earlier that year, in June or July, appellant had approached Alejandro Aguilera Herrera, a plumber, urging him to invest in the Palmer property. Herrera knew appellant as Enrique Sandoval. He met appellant through Alfonso Corona, a mutual acquaintance.

---

laundering, with a one-year excessive value enhancement; and one eight-month term for each of three section 115, subdivision (a) offenses. (Each eight-month term is one-third of a two-year middle term.)

[4] J.P. Morgan Chase acquired the assets of WAMU before appellant's trial.

2

Appellant and Corona frequented a restaurant that Herrera owned with his brother, Alfredo Aguilera. Appellant asked Herrera to look at the Palmer property and give his opinion about the quality of its plumbing. During the inspection, appellant said that Herrera could own or invest in the Palmer property. Herrera said it was impossible. A month or two later, at the restaurant, appellant asked Herrera something like, "What . . . if I told you there is a way to buy that property?" Herrera said, "No, not for me." Appellant also asked if Herrera would like to live there.

On three or four subsequent occasions, appellant urged Herrera to buy or invest in the Palmer property. He suggested that Herrera could "pull up some money out of the property that [he bought with his] brother [Aguilera] . . . and . . . pull out lines of credit." Herrera was not familiar with lines of credit. Herrera and his brother owned a house on Avenida De Las Flores, and a house on Calle Olivo, in Thousand Oaks. Herrera also owned a house on Calle Violeta in Thousand Oaks.

Later still, at appellant's suggestion, Herrera met with Terry Tucker, Corona and appellant at the Tucker home. Herrera had done plumbing projects for the Tuckers and knew they were in the real estate business. He had referred appellant to the Tuckers at one point. Terry explained that Herrera could obtain more than one home equity line of credit (HELOC) from his property. Herrera asked if that was legal. Terry said, "Yes." Corona and appellant said that Herrera could invest with them, and they had plans to buy properties. Herrera said he needed time to think about their idea.

At appellant's suggestion, Herrera again met with appellant, Corona, and Terry. They told Herrera he could obtain money to invest in the Palmer property, by using his property as security for HELOCs. When Herrera asked about the amount of the down payment, the men said it was nearly $600,000. Herrera again refused to invest in the property.

Appellant and Corona continued meeting with Herrera to urge him to invest in the Palmer property. Eventually, he agreed to do so. As he understood their agreement, Herrera would provide half of the down payment by obtaining HELOCs on

3

his property, and appellant would supply the other half. Appellant would make the Palmer property mortgage payments and give Herrera money for his HELOC payments. The remaining money from Herrera's HELOCs would be applied to his share of the Palmer property mortgage, and to purchase other real estate investments. Herrera would live in the Palmer property. If the property sold, appellant and Herrera would split any profits "50 and 50." Herrera did not know that appellant had previously agreed to purchase the Palmer property.

Terry said he would be in charge of obtaining the HELOCs.[5] Terry and appellant directed Herrera to several HELOC lenders. On October 28, 2005, appellant took Herrera to Wells Fargo in Moorpark, WAMU in Ventura, and E-loan in Camarillo. Herrera went to Bank of America on November 2, 2005, either alone or with appellant. Herrera's HELOCs totaled $788,826 ($190,900 from Wells Fargo; $174,598 from WAMU; $190,000 from E-loan; and $233,328 from Bank of America). At least two of the HELOCs were secured by the Las Flores property.

On November 2, 2005, appellant accompanied Herrera to Wells Fargo Bank and WAMU. Herrera used his HELOCs to obtain cashier's checks payable to Lawyers Title in the amounts of $190,000 (at Wells Fargo) and $174,000 (at WAMU). He gave those checks to appellant, who deposited them in the escrow account for the Palmer property purchase. In addition, Herrera exhausted his $233,328 Bank of America HELOC and his $190,000 E-loan HELOC to write two large checks. At appellant's direction, he gave one of those checks to appellant, and gave the other check to Corona. The value of the checks that Herrera delivered to appellant and Corona was nearly $800,000.

On November 4, 2005, the county recorded a deed of trust granting WAMU a security interest in the Palmer property (for Padilla's $1,366,168 note to WAMU). That

---

[5] The jury heard testimony that Terry and Cheri Tucker were serving sentences for federal bank fraud crimes. Appellant argued that the criminally sophisticated Terry was responsible for Herrera's HELOC-related losses, rather than the relatively naïve appellant.

4

deed transferred title to the Palmer property from the builder to "Antonio Padilla, a single man." Lawyers Title delivered the Palmer property keys to appellant upon the close of escrow.

In November 2005, Herrera and his family moved to the Palmer property. He repeatedly asked appellant, whom he knew as Enrique Sandoval, why the post office was delivering mail for Antonio Padilla to the property. After initially failing to respond, appellant said there were "some things we need to do to keep growing."

Herrera also asked appellant why he had not provided him with any recorded document showing Herrera's interest in the Palmer property. Herrera wanted his wife, Filomena Avalos, to be listed as an owner of the property. On January 31, 2006, appellant, using the name Padilla, signed a grant deed that transferred an undivided 50 percent interest in the Palmer property to Avalos, as a tenant in common with Padilla. That deed recorded on February 7, 2006.

On July 15, 2006, appellant, again identified as Padilla, borrowed $262,000 from ACE Dreams. The loan was secured by a deed of trust that granted ACE Dreams an interest in the Palmer property. Appellant never told Herrera he was using that property to secure a loan. Herrera received a check for about $270,000 from ACE Dreams, a company he thought was founded by appellant and Corona.

For nearly two years, appellant made payments on the WAMU mortgage, with checks that bore a variety of account names. (The account names included Paradise Insurance Agency, Pacific Economic Multi-services, Miguel Del Rio, Maria Maldonado, and Maria Lux.) Appellant stopped making mortgage payments on the Palmer property in September 2007. Appellant had provided Herrera with money to make the required HELOC payments. When he ceased doing so, Herrera could not make all of the HELOC payments, and the lender foreclosed on his Las Flores property.

On October 18, 2007, appellant, as Padilla, signed a deed to quitclaim part of his remaining interest in the Palmer property to Avalos (Herrera's wife). He gave Herrera the quitclaim deed and asked him to obtain HELOCs on the Palmer property in

5

Avalos's name. Herrera refused. Appellant had already ceased providing Herrera money for his existing HELOC payments. The county recorded the Padilla-Avalos quitclaim deed on October 18, 2007. However, 30 minutes earlier, it had recorded the July 2006 deed that granted ACE Dreams an interest in the Palmer property. Both deeds were recorded at appellant's request.

In 2008, an official went to the Palmer property and advised Herrera that his family had approximately two weeks to vacate the premises. They moved from the Palmer property into the Las Flores property, but moved again when the lender foreclosed on that property. Herrera tried without success to reach appellant by telephoning and visiting his home and office. Appellant had just "disappeared," several months before the Palmer property foreclosure.

On June 4, 2008, WAMU foreclosed on the Palmer property. It sold the property and suffered a loss of about $733,000, including the difference between the property's $941,000 sale price and the outstanding WAMU mortgage balance, plus attorneys' fees, taxes, and sales expenses.

Herrera received approximately $310,000 from appellant. That amount includes an ACE Dreams check for approximately $270,000, and several other payments, with a combined value of approximately $39,000.

*Identity Evidence*

Appellant had a driver's license in his name (Enrique Sandoval Martinez). He had another driver's license in the name of Antonio Padilla.

Ezequiel Armendariz, an officer for the Immigration and Customs Enforcement (ICE) agency, testified regarding two immigration applications that appellant submitted to ICE. He submitted one application under the name Enrique Sandoval Martinez and another application under the name Antonio Padilla.

Appellant used the name Miguel del Rio to buy property in Nipomo, California. Appellant, as del Rio, provided a bank with a driver's license number that purportedly belonged to him. That number actually belonged to a Caucasian female.

6

Antonio Padilla's WAMU loan file includes an insurance binder from Paradise Insurance agent Enrique Sandoval. It also contains a letter from Enrique Sandoval, of Pacific Multi-Services, to certify their preparation of Padilla's 2003 and 2004 tax returns. Miguel del Rio's loan file contains a tax return prepared by Antonio Padilla.

Adela Vargas met appellant when they were children in Guatemala and knew him as Enrique Sandoval Martinez. They were married from 1993 to 2009, and had a child. Vargas was not aware that appellant used the names Antonio Padilla and Miguel Del Rio. In 2005, Vargas and appellant moved into a house on Emerson Street in Thousand Oaks (Emerson property). Before moving there, appellant told her to sign some documents and not to ask questions. Three deeds for the Emerson property were recorded in 2005; each deed showed Adela Sandoval, a single woman, as the grantee, subject to a lender's security interest. Vargas remained at the Emerson property until May or June 2008. She moved after learning that the lender was foreclosing on the property. Sometime earlier, appellant had left the Emerson property without telling Vargas where he was going.

## DISCUSSION
### *Sufficiency of the Evidence - Theft*

Appellant contends the evidence is insufficient to support his theft conviction, under either a theft by trick or theft by embezzlement theory. He claims that there is no evidence that he intended to permanently deprive Herrera of his property, a requisite element of theft under either theory. We disagree.

In reviewing claims of insufficient evidence, "we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence–that is, evidence that is reasonable, credible, and of solid value–from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . [W]e presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Wilson* (2008) 44 Cal.4th 758, 806,

7

[internal citations and quotation marks omitted].) "Unless it is clearly shown that 'on no hypothesis whatever is there sufficient substantial evidence to support the verdict,' the conviction will not be reversed." (*People v. Misa* (2006) 140 Cal.App.4th 837, 842.)

The requisite intent for theft is the "intent to permanently deprive," which is not intended literally, but "is merely a shorthand way of describing" the intent to steal. (*People v. Avery* (2002) 27 Cal.4th 49, 55.) A defendant's "'intent to deprive an owner of the main value of his property is equivalent to the intent to permanently deprive an owner of property.'" (*Id*. at p. 57.) The intent element is satisfied "by the intent to deprive [an owner of his property] temporarily but for an unreasonable time so as to deprive the [owner] of a major portion of its value or enjoyment." (*Id*. at p. 58.)

In arguing there is no evidence of his intent to permanently deprive Herrera of his money, appellant selectively stresses the evidence that supports his position. For example, he put Herrera's wife's name on the deed; and for a two-year period, appellant made the Palmer property mortgage payments, allowed Herrera to use the property, and provided Herrera money for HELOC payments. However, appellant took full title to the Palmer property (as Padilla) when escrow closed in early November 2005. It was only *after* Herrera expressed concern about the absence of any recorded document reflecting his interest in the property that appellant granted Herrera's wife an interest in the Palmer property. The deed conveying her interests did not record until early February 2006. In July 2006, without Herrera's consent or knowledge, appellant granted ACE Dreams a security interest in the Palmer property. Moreover, the primary lender foreclosed on the Palmer property and the HELOC lender foreclosed on Herrera's Las Flores property, after appellant stopped making mortgage payments and providing Herrera money for his HELOC account payments. The evidence supports the inference that appellant's conduct deprived Herrera of the "main value of his property," and that he intended to permanently deprive Herrera of his money. (*People v. Avery, supra*, 27 Cal.4th at p. 57.)

We also reject appellant's claim that there is insufficient evidence to support a conviction of theft by embezzlement because there is no evidence that he

8

appropriated Herrera's money for his own use. A conviction for theft by embezzlement requires that the defendant appropriate the property of another for his own benefit. (See *People v. Fenderson* (2010) 188 Cal.App.4th 625, 636- 637, 641.) Here, appellant used Herrera's money for the down payment on the Palmer property, without listing Herrera or his wife on the deed. Although he transferred an interest in that property to Herrera's wife after Herrera complained to him, appellant ceased making the mortgage payments, which caused the lender to foreclose upon and sell the Palmer property. Appellant had also pledged the Palmer property as security for a loan without Herrera's knowledge or consent. He ceased providing Herrera funds for HELOC payments, and Herrera consequently lost the Las Flores property. Based on the evidence, the jury could reasonably conclude that appellant appropriated Herrera's money for his own use.

*Sufficiency of the Evidence - Excess Taking Enhancement*

Appellant contends that there is insufficient evidence to support the finding that the property he took from Herrera caused Herrera to lose in excess of $150,000. (§ 12022.6, subd. (a)(2).) We disagree.

"We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction." (*People v. Gonzales* (2011) 51 Cal.4th 894, 941.) If the evidence reasonably supports the jury's findings, reversal of the judgment is not warranted merely because the evidence might also support a contrary finding. (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.)

The version of section 12022.6, subdivision (a)(2) applicable at the time of appellant's theft provided an enhancement for taking property during the commission of a felony, where the loss exceeded $150,000. "The word 'loss,' as used in section 12022.6 in the context of the *taking* of property, . . . includes any dispossession which constitutes theft of the victim's property." (*People v. Bates* (1980) 113 Cal.App.3d 481, 484.)

Appellant argues that at most, Herrera lost $51,444, because he gave appellant $554,000 to invest in the Palmer property and appellant "returned $503,556" of that money. "It is of no consequence that most of the stolen property was eventually

9

recovered" (*People v. Loera* (1984) 159 Cal.App.3d 992, 999), or that the owner's ultimate loss was less than $150,000 because Penal Code section 12022.6 is applicable "'without regard for the duration of the dispossession.'" (*Id.* at p. 1000.) We are not persuaded by appellant's suggestion that *Loera* and similar cases should not apply to his case where, he argues, the "amount and timing of the taking is less clear."

Moreover, viewing the evidence in the light most favorable to the judgment, the jury could reasonably infer that Herrera's loss exceeded $150,000. At appellant's direction, Herrera provided appellant and Corona with checks that totaled approximately $787,000.

The $503,556 that appellant claims he returned to Herrera includes Palmer property mortgage payments that total $83,556. Herrera did not receive mortgage payments for the Palmer property; WAMU did. Appellant's failure to continue paying WAMU led to its foreclosure and sale of the Palmer property. His failure to continue paying Herrera as he agreed to do led the HELOC lender to foreclose on Herrera's Las Flores property.

*Evidence Code Section 352*

Appellant contends that the trial court committed prejudicial error by admitting evidence that he submitted immigration applications in two names (Enrique Sandoval Martinez and Antonio Padilla). Specifically, he argues that the court should have excluded the immigration evidence pursuant to Evidence Code section 352 because it was unduly prejudicial. We disagree.

We review the trial court's evidentiary rulings under the deferential abuse of discretion standard. (*People v. Hamilton* (2009) 45 Cal.4th 863, 929-930.) Evidence Code section 352 authorizes the trial court to exclude evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'Evidence is substantially more prejudicial than probative . . . if, . . . it poses an intolerable "risk to the fairness of the proceedings or the

10

reliability of the outcome."'" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.) "'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.' [Citation.]" (*Id.* at p. 145.)

Here, appellant argues that the immigration evidence was unduly prejudicial because it "established that [he] is an immigrant [who] committed fraud against the United States," and it was "likely to sway the jury to decide the case based on an emotional bias against illegal residents rather than the evidence." The challenged immigration evidence was not unduly prejudicial. It was relevant to show how appellant acquired the false Antonio Padilla identity that he used in perpetrating the crimes. It was also relevant to rebut appellant's claim that he was relatively naive, in contrast to sophisticated criminals such as Terry Tucker who, he argued, directed Herrera to obtain the HELOCs to invest in the Palmer property. The admission of the challenged immigration evidence did not pose an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." (*People v. Eubanks, supra,* 53 Cal.4th at p. 144.) Moreover, even if the court had erred by admitting that evidence, the error was harmless. The immigration evidence formed a small part of the prosecution case, and was presented through the brief testimony of one witness in a trial with fourteen prosecution witnesses. It is not reasonably probable that the jury would have reached a result more favorable to the appellant absent such evidence. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.)

*CALCRIM No. 2020 (Theories of Guilt for Making False Financial Statements)*

Appellant contends that the trial court erred by instructing the jury, with CALMCRIM No. 2020, that it could conclude that appellant violated section 532a, subdivision (1), if it found that he had made a false written statement about his intent to occupy the Palmer Drive residence. Appellant is wrong.

Appellant signed an "Owner Occupancy Agreement" stating that he would occupy the Palmer property, and acknowledging that the "Lender [WAMU] would not have agreed to make the loan if the Property were not to be owner-occupied." His loan

application stated the Palmer property would be his primary residence. Based on that evidence, the court instructed the jury as follows, in relevant part:

"The defendant is charged in Count 1 with making or causing to be made a false written statement about his/her financial condition, means or ability to pay in violation of Penal Code section 532a(1). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant made or caused to be made a false written statement about his financial condition, means or ability to pay; [¶] 2. The defendant knew that the statement was false; [¶] 3. When the defendant made the statement or caused the statement to be made, he intended that the statement be relied on; AND [¶] 4. The defendant made the statement or caused the statement to be made to obtain the making of a loan for his benefit.

"A person may make a false statement or cause a false statement to be made either directly or indirectly, or through his or her agent. . . . [¶] The People allege that the defendant made or caused to be made the following statements: [¶] . . . . [¶] He intended to occupy the 12216 Palmer Drive property as his primary residence . . . .

"You may not find the defendant guilty unless you all agree that the People have proved that the defendant made or caused to be made at least one of these statements and that the statement was false. You must all agree on which false statement he made or caused to be made."

Appellant argues that by allowing the jury to convict him of making a false statement in violation of section 532a, subdivision (1), based upon his statement of intent to occupy the Palmer property, the trial court eliminated an element of the crime—that the statement must be specific to his ability to pay. His argument rests on the faulty premise that his stated intent to occupy the property was not related to his financial condition or ability to pay. In so arguing, appellant cites *People v. Vincent* (1993) 19 Cal.App.4th 696, 702. In *Vincent*, the defendant made false statements concerning her name, address and social security number when she opened two bank accounts. (*Ibid.*) She was convicted of making a false financial statement regarding her financial condition

or ability to pay in violation of section 532a, subdivision (1). In reversing her conviction, the *Vincent* court held that her false statements did not concern her financial condition or ability to pay. (*Id*. at p.702.)

Appellant's case is distinguishable from *Vincent*. The false identity statements of the defendant in *Vincent* did not concern her income, assets, or expenses, or other matters relating to her ability to pay or financial condition. In contrast, appellant's statement of intent to occupy the Palmer property related specifically to his future expenses, and thus, his financial condition and ability to pay for the WAMU loan. His loan application included information about his assets, liabilities, income, and expenses, including his proposed housing expense (in the Palmer property, if he qualified for the loan). His occupation of the Palmer property necessarily concerned his financial condition and ability to pay the lender, *i.e*., the lender could reasonably assume that appellant's only housing expense would be that attributable to the Palmer property, and it would use that expense to assess his ability to pay the loan.

*Section 654*

Appellant argues that the execution of three consecutive sentences for three convictions of offering a false instrument for recording violates the section 654 bar against double punishment because those crimes shared a single criminal objective. We disagree.

Ordinarily, section 654 prohibits multiple punishments for more than one offense where the offenses are committed during an "indivisible transaction" having a single criminal objective. (*People v. Gangemi* (1993) 13 Cal.App.4th 1790, 1799.) However, a different rule applies to offering false instruments for filing or recording in violation of section 115. (*Id*. at p. 1800.) "For purposes of prosecution under this section [115], each act of procurement or of offering a false or forged instrument to be filed, registered, or recorded shall be considered a separately punishable offense." (§ 115, subd. (d).) "This language demonstrates an express legislative intent to exclude section 115 from the penalty limitations of section 654. Thus, the Legislature has unmistakably

authorized the imposition of separate penalties for each prohibited act even though they may be part of a continuous course of conduct and have the same objective. . . . [E]ach false filing is separately punishable." (*Gangemi,* at p. 1800.)

DISPOSITION

The judgment is affirmed

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

14

Patricia M. Murphy, Judge

Superior Court County of Ventura

_____

Christina Alvarez Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.