Filed 3/5/21  P. v. Clotfelter CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRUCE LEE CLOTFELTER,<br><br>        Defendant and Appellant. | A155134<br><br>(Napa County<br>Super. Ct. No. CR182578)<br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING |

BY THE COURT:

It is ordered that the opinion filed herein on February 4, 2021, be modified as follows:

On page 33, insert the following after the first full paragraph under the heading "**Substantial Evidence**":

"In his petition for rehearing, defendant attacks this reasoning as 'superficial' because it 'fails to meaningfully address appellant's sufficiency of the evidence claim (the most important issue in this case), and because it is inconsistent with (and does not even mention) our Supreme Court's controlling decision in *People v. Kunkin* (1973) 9 Cal.3d 245, 250-251.'

"*Kunkin* entered this case in an unusual fashion.  In response to defendant's contention that his theft by larceny convictions were not supported by substantial

1

evidence, the Attorney General conceded that theft by larceny was an incorrect characterization of what defendant did, which should have been treated as theft by false pretense. The Attorney General then proceeded to argue that we should reject defendant's claim because the record did have ample substantial evidence that defendant had committed multiple counts of theft by false pretense. It was in response to this argument that *Kunkin* (along with *Pennington*, *Chiarella*, and *McCormick*) was first cited, by defendant in his reply brief.

"Kunkin was convicted of receiving stolen property. The question on appeal was whether there was substantial evidence to prove that the property (1) was stolen, and (2) Kunkin knew that it was stolen. The Supreme Court answered the first question in the affirmative, the second in the negative. Before commencing its analysis, the court quoted the language of section 496 and stated:

" 'This broad language is intended to include property which has been obtained not only by theft by larceny (i.e., stealing) but also by such other forms of theft as embezzlement. We note at the outset, however, that the jury in this case was instructed on the elements of theft by larceny only. Thus even though section 496 applies by its terms to the receipt of property obtained by embezzlement, the convictions below could only have been predicated on the jury's finding that the [property] was stolen, not embezzled. *We, of course, cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule*. [Citation.] The immediate question, accordingly, is whether there is substantial evidence that Reznick committed a theft by larceny apart from the suggestion that, because of his employment, he might have committed theft by embezzlement.' (*People v. Kunkin*, *supra*, 9 Cal.3d, at pp. 250-251, italics added, fns. omitted.) There are compelling reasons why the italicized language should not be treated, in defendant's characterization, as 'controlling.'

"First, unlike here, the Attorney General in *Kunkin* was not attempting to have the conviction upheld on a new theory of the crime.  Thus, the italicized. language was simply the statement of a truism that might well qualify as dictum. Second, and again unlike this case, there was no claim in *Kunkin* that the jury had been misinstructed, still prejudicially so.  Thus, we are not 'seeking to reconcile a jury verdict with the substantial evidence' because we have already determined that the theft convictions must be reversed for instructional error.  We simply do not reach the substantial evidence issue.  Third, *Kunkin* does not, as defendant apparently believes, actually hold that a reviewing court must always address a substantial evidence claim.  Defendant does not cite, and our research has not found, a single reported instance where *Kunkin* has been applied to preclude retrial by a properly instructed jury."

This modification does not effect a change in the judgment.  The Petition for Rehearing is denied.

Date: _____                    _____
                                               Kline, P.J.

A155134, *People v. Clotfelter*

Filed 2/4/21  P. v. Clotfelter CA1/2 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRUCE LEE CLOTFELTER,<br><br>        Defendant and Appellant. | A155134<br><br>(Napa County<br>Super. Ct. No. CR182578) |

Defendant was adjudicated a Sexually Violent Predator (SVP).  That status burdened defendant with numerous statutory disabilities that he wished to evade by changing his name.  His attempt to do so came to the attention of state and federal authorities, and resulted in criminal charges.  A jury convicted him of one count of perjury (Pen. Code, § 118[1]); two counts of identity theft—technically the unauthorized use of personal identifying information of another person—(§ 530, subd. (a)); two counts of document forgery with intent to defraud (§ 470, subd. (d)); and seven counts of grand theft (§ 487, subd. (a)).  The jury also found true allegations that defendant had three prior sex-offense "strike" convictions.  The trial court denied defendant's motion to strike one or more of the previous conviction findings

---

[1]  Statutory references are to the Penal Code unless otherwise indicated.

1

pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*), and sentenced him to state prison for an aggregate term of 300 years to life.

On this timely appeal, defendant contends: (1) in accordance with *In re Williamson* (1954) 43 Cal.2d 651, his perjury and grand theft convictions must be invalidated because he could only be convicted under more specific misdemeanor statutes; (2) his grand theft convictions are not supported by substantial evidence; (3) only one grand theft conviction was proper because there was only a single continuous offense; (4) there were two instances of prejudicial instructional error; (5) the trial court abused its discretion in denying his *Romero* motion; (6) section 654 precludes separate sentences for forgery and identity theft; and (7) the aggregate sentence constitutes cruel and unusual punishment under both the federal and the state constitutions.

With respect to the seven theft convictions, we conclude that defendant could be convicted of no more than four counts, but all the convictions must be reversed because the jury was not instructed on theft by false pretenses, the particular form of the crime advanced at trial. The convictions for perjury, identity theft, and forgery will be affirmed, but two of the sentences must be stayed pursuant to section 654. Because we remand for possible retrial of the theft charges, and resentencing, we do not address the cruel and unusual punishment claim.

## BACKGROUND

The evidence heard by the jury is virtually without dispute, making it necessary only to summarize it here, viewed most favorably in support of the verdicts (*People v. Nelson* (2011) 51 Cal.4th 198, 210), as follows:

In 1989 defendant was convicted of three counts of committing lewd or lascivious acts upon a child under the age of 14 (§ 288, subd. (a)). In 1997, he

2

was adjudicated an SVP, and civilly committed to a state hospital for treatment. He was released in June 2007 and settled in Napa County. As required by law, he registered as a sex offender with local law enforcement.

Defendant also applied for SSI benefits from the Social Security Administration (SSA), which was approved under his own name. He began receiving monthly payments in February 2008 (but backdated to November of 2007). Defendant was repeatedly told that he must report all sources of income; that benefits could terminate if his income rose above $2,000 a month; and that there would be periodic "redetermination" interviews to confirm his eligibility for continued benefits.

About this time, defendant decided to change his name. In January 2008, he petitioned the Napa Superior Court to change his name to "Andrew Bruce Vail." That petition was denied. In January of 2009, he filed another petition, this time asking to change his legal name to the one he used for writing, "Dalton Bruce Vail." This petition was also denied.

Desperate to escape his criminal past, defendant then resolved to simply rename himself: "I looked on the Internet and I just simply searched . . . ways to change your name without the court. And there were a number of publications . . . that you could do it by customary usage. That you simply chose another name and begin using that name and then you can claim that that is your name."

Defendant already had a Consular Report of Birth Abroad (CRBA), the equivalent of a birth certificate for an American citizen born in another county (in defendant's case, Mexico), issued by the U.S. Department of State. Defendant wrote to that agency asking how to amend his CRBA to his new, self-bestowed name. He was told he had to prove he had been using the new name for at least five years.

3

Because defendant was told he had to have a passport before it could be amended with a different name, defendant applied for a passport in his own name. He received it in March 2010.

In June of that year, defendant submitted an application to the SSA to have his benefits paid under the name of Dalton Bruce Vail. To an SSA employee defendant "submitted a court-ordered name change document" (defendant called it a "document that I had created that was entitled Affidavit for Common Law Name Change"). Based on this bogus document, SSA accepted defendant's application.

The same thing occurred several months later, allowing defendant to obtain an amended CRBA in the name of Dalton B. Vail from the Department of State.

Among the "doctored" documents defendant admitted submitting was a "contribution statement" from the Grace Church he attended in Napa. This document, which was dated January 14, 2005, purported to show that in 2004 (while he was actually in Atascadero State Hospital) Dalton Vail made specified donations to the church.

Another document created by defendant that was submitted with the amended CRBA application was a UPS invoice dated May 15, 2005, purporting to record that Dalton Vail of "Vail Enterprises" paid $11.05 to ship an item from himself to himself in Napa from Orange County.

Defendant used the amended CRBA to apply for his California Driver's License to show the name Dalton Vail instead of Bruce Clotfelter. Months later, using the name Dalton Vail, defendant applied for a different type of operator's license; on the application defendant answered "No" to the question: "[H]ave you applied for a driver's license or identification card in

4

California or another state/county using a different name or number within the past 10 years?"

In October of 2016, during an "annual sweep" of sex offenders' residences, Napa police discovered in defendant's house copies of checks totaling approximately $30,000, a Mexican passport in the name of Bruce Clotfelter, and a U.S. passport in the name of Bruce Vail. This discovery was communicated to the SSA and the Department of State.[2] Pursuant to a warrant, Napa police seized defendant's computer. On it were discovered some of the altered documents defendant had submitted to the SSA and the Department of State. The UPS invoice and the Grace Church documents attracted particular attention because defendant was committed to a state hospital as an SVP at the time they were purportedly dated.

In January 2017, the SSA discovered that defendant had failed to report, as required, the existence of three bank accounts. That month SSA Special Agent Donald Kayl and Napa Police Sergeant Amy Hunter interviewed defendant when he came in for a scheduled meeting. It was a very long meeting. After initially denying he had done anything improper, defendant admitted the machinations to get the documents in the name of Dalton Vail. He also admitted lying to the SSA about his income. Defendant detailed how he had created the contribution from Grace Church and admitted being "really good" at "doctoring" or "changing documents." Defendant acknowledged that this "doctoring" was illegal.

When this interview was concluded, defendant then went to the Napa Police Department, where Hunter interviewed him for 90 minutes. The interview was recorded on videotape, and the tape was played for the jury.

---

[2] The State Department immediately revoked defendant's passport.

According to Sergeant Hunter, defendant "admitted multiple times throughout the interviews" to forging documents and taking money from the SSA to which he was not entitled.

Defendant began his testimony by admitting his five felony convictions, and the fact that he was an SVP who spent 10 years in state hospitals. He admitted creating and altering documents to escape his criminal history. But he did not change his name to "hide from the police" or avoid the sex offender registration requirements. The name change was not intended to "confuse" anyone.

Defendant did not think getting money from the SSA was wrong. He did not consider it stealing because he was "entitled" to it. He used the money to pay his living expenses, and the expenses of "Vail Enterprises," his handyman business. It was not uncommon for defendant to have more than $2,000 in his bank account, but this was his parents' money that he was "managing." He evaded the SSA limit by having his mother empty his bank account at the start of each month and "give it to me so that won't be a problem." He did not think his "Vail Enterprises" accounts mattered because "those were not listed as my resources." The $30,000 in checks were to compensate him for a traffic accident; he didn't report it to the SSA because "it wasn't income," and thus was not taxable.

## DISCUSSION

Defendant's contentions range across various issues and various of the charges found true by the jury. Some of his arguments concern only sentencing. To simplify matters, we have grouped issues not involving sentencing by the offense.

6

**The Theft Counts**

As previously stated, defendant was convicted of seven counts of grand theft. In the first, count 7, it was alleged that "On or about January through December 2010," defendant unlawfully took more than $950 dollars which was "the property of the Social Security Administration." The second, count 8, was to the same effect, except that it covered the period "On or about January through December 2011." The third, count 9, covered the period "On or about January through December 2012." Count 10 covered 2013, count 11 covered 2014, count 12 covered 2015, and count 13 the year 2016. In all seven counts, the named victim was the Social Security Administration, and the amount taken was more than $950. For each of these counts, defendant was sentenced to a Three Strikes sentence of 25 years to life, each to be served consecutively.

Given that the theft convictions amount for 175 years of defendant's aggregate sentence of 300 years to life, it is no surprise that they form the primary focus of this appeal. He asserts the theft charges were mischarged, misinstructed, unproven, and missentenced. We address these attacks in turn.

**The Theft Charges As Alleged**

**I**

Citing *In re Williamson, supra,* 43 Cal.2d 651, defendant contends it was improper to charge him with the felony of grand theft, and that he could only properly be charged with the *misdemeanor* charge of violating Welfare and Institutions Code section 11482.

The Attorney General urges defendant's claim is forfeited because he is raising it for the first time on appeal. We have rejected this argument before, on the ground that the claim amounts to the challenge of an unauthorized

7

sentence, which may be raised at any time. (*People v. Harper* (2020) 44 Cal.App.5th 172, 185, fn. 12, following *People v. Henry* (2018) 28 Cal.App.5th 786.) We therefore turn to the merits.

Theft is defined as follows: "Every person who shall feloniously steal, take, carry, lead, or drive sway the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property . . . is guilty of theft." (§ 484, subd. (a).) "Grand theft is theft committed . . . [¶] (a) When the money . . . or personal property taken is of a value exceeding nine hundred fifty dollars . . . ." (§ 487, subd. (a).)

By contrast, Welfare and Institutions Code section 11482 provides in pertinent part : "Any person other than a needy child, who willfully and knowingly, with the intent to deceive, makes a false statement or representation or knowingly fails to disclose a material fact to obtain aid, or who, knowing he or she is not entitled thereto, attempts to obtain aid or to continue to receive aid to which he or she is not entitled, or a larger amount than that to which he or she is legally entitled, is guilty of a misdemeanor, except as specified in Section 11482.5[3] and shall be subject to prosecution

---

[3] "Any person who knowingly makes more than one application for aid with the intent of establishing multiple entitlements for any person for the same period, or who makes an application for aid by claiming a false identity for any person or by making an application for a fictitious or nonexistent person, is guilty of a felony and shall be subject to prosecution under the provisions of Chapter 9 (commencing with Section 10980) of Part 2." (Welf. & Inst. Code, § 11482.5.)

There are additional statutes in a similar vein:

"Any person other than a needy child, who willfully and knowingly receives or uses any part of an aid grant paid pursuant to this chapter for a

under the provisions of Chapter 9 (commencing with Section 10980) of Part 2."

Our Supreme Court explained the operation of the *Williamson* rule as follows:

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute.  In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute.  [Citation.]  'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.'  (*People*

---

purpose other than support of the needy children and the caretaker involved, is guilty of a misdemeanor."  (Welf. & Inst. Code, § 11480.)

"Except as specified in Section 11483.5, whenever any person has, by means of false statement or representation or by impersonation or other fraudulent device, obtained aid for a child not in fact entitled thereto, the person obtaining such aid shall be subject to prosecution under the provisions of Chapter 9 (commencing with Section 10980) of Part 2.  [¶] When the allegation is limited to failure to report not more than two thousand dollars ($2,000) of income or resources, or the failure to report the presence of an additional person or persons in the household, all actions necessary to secure restitution shall be brought against persons in violation of Section 10980. The action for restitution may be satisfied by sending a registered letter requesting restitution to the last address at which the person was receiving public assistance."  (Welf. & Inst. Code, § 11483.)

"Any person who obtains more than one aid payment for any person as a result of knowingly making more than one application for aid with the intent of establishing multiple entitlements for that person during the same period, or who obtains aid for any person by making an application claiming a false identity or by making an application for a fictitious or nonexistent person, is guilty of a felony, and shall be subject to prosecution under the provisions of Chapter 9 (commencing with Section 10980) of Part 2."  (Welf. & Inst. Code, § 11483.5.)

9

*v. Walker* (2002) 29 Cal.4th 577, 586.)  'The doctrine that a specific statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out legislative intent.  The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply.  Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and "requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . . and the special provision . . . ." (*People v. Gilbert* [(1969)] 1 Cal.3d [475,] 481].)' (*People v. Jenkins* (1980) 28 Cal.3d 494, 505–506 [(*Jenkins*)] . . . .)

"Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' (*People v. Watson* (1981) 30 Cal.3d 290, 295–296 (*Watson*).)  In its clearest application, the rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute.  In *Williamson,* for example, the defendant was convicted under the general conspiracy statute, Penal Code section 182, of conspiring to commit the crime of contracting without a license in violation of section 7028 of the Business and Professions Code.  A violation of Penal Code section 182 was punishable as either a misdemeanor or a felony.  The defendant argued that his conduct was punishable only under a special statute, Business and Professions Code former section 7030 [citation], which made it a misdemeanor to 'conspire[ ] with another person to violate any of the provisions of this chapter.'  This

10

court agreed.  We explained, 'To conclude that the punishment for the violation of section 7030 of the Business and Professions Code is stated in section 182 of the Penal Code, which deals with conspiracies in general, would be inconsistent with the designation of the particular conspiracy as a misdemeanor.' (*Williamson, supra,* 43 Cal.2d at p. 655; see also *People v. Gilbert, supra,* 1 Cal.3d at p. 481, [prosecution for theft barred by special statute prohibiting use of false statement to obtain welfare, because 'any conduct which violated [the welfare fraud statute] would also constitute a violation of the theft provision of the Penal Code'].)

" On the other hand, if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the general statute.  In such situations, because the general statute contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely.  For example, in *Watson, supra,* 30 Cal.3d 290, the defendant was charged with second degree implied malice murder based on a fatal automobile collision that occurred when the defendant was intoxicated and had been driving at excessive speeds.  On appeal, the defendant argued that he could be convicted only of vehicular manslaughter under Penal Code section 192 because that statute specifically addressed killing while driving a vehicle, whereas the murder statute was a more general statute that addressed a broad range of unlawful killings.  We rejected that argument because a murder conviction requires a finding of malice, while vehicular manslaughter requires only gross negligence.  Because of the different mental state required, 'a violation of the vehicular manslaughter statute would not necessarily or commonly result in a violation

11

of the general murder statute.  Thus, the *Williamson* rule is inapplicable.'
(*Watson, supra,* at p. 296.)

"However, that the general statute contains an element not within the special statute does not necessarily mean that the *Williamson* rule does not apply.  'It is not correct to assume that the [*Williamson*] rule is inapplicable whenever the general statute contains an element not found within the four corners of the "special" law.  Rather, the courts must consider the *context* in which the statutes are placed.  If it appears from the entire context that a violation of the "special" statute will necessarily or commonly result in a violation of the "general" statute, the *Williamson* rule may apply even though the elements of the general statute are not mirrored on the face of the special statute.' (*Jenkins, supra,* 28 Cal.3d at p. 502.)

"For example, in *People v. Ruster* (1976) 16 Cal.3d 690 . . .), this court compared the general statute prohibiting forgery with the special misdemeanor statute prohibiting unemployment insurance fraud.  In *Ruster,* the defendant filed claims for unemployment benefits using a false name and Social Security number.  He was prosecuted under the general forgery statute, Penal Code section 470.  The defendant argued that his actions could be prosecuted only under section 2101 of the Unemployment Insurance Code, which made it a misdemeanor to 'willfully make a false statement [or] representation or knowingly fail to disclose a material fact . . . to obtain . . . any benefit or payment' for unemployment insurance.  (Unemp. Ins.Code, former § 2101, subd. (a).)  The People argued that because one element of forgery—the signing of the name of another—is not an element of Unemployment Insurance Code section 2101, that statute 'does not supplant Penal Code section 470 when unemployment fraud involves forgery.  (*Ruster, supra,* at p. 695.)  We rejected the People's argument and applied the

*Williamson* rule to preclude the forgery prosecution. We stated that 'the Legislature unquestionably contemplated that the special statute might be violated by means of forgery. Indeed, applying for aid under a false identity, which entails signing eligibility questionnaires and pay certification cards with a false name, is apparently one of the most common forms of unemployment insurance fraud.' (*Ruster, supra,* at p. 699.)" (*People v. Murphy* (2011) 52 Cal.4th 81, 86–88.)

In short, the *Williamson* rule does not apply when "a felony statute requires a more culpable mental state than a misdemeanor statute proscribing the same behavior." (*Hudson v. Superior Court* (2017) 7 Cal.App.5th 999, 1007.) "On the other hand, we do not assume the Legislature intended to preclude prosecution under the general statute if it 'contains an element that is not contained in the special statute, and that element would not commonly occur in the context of a violation of the special statute.' " (*In re Charles G.* (2017) 14 Cal.App.5th 945, 949, quoting *Murphy*; accord, *People v. Medelez* (2016) 2 Cal.App.5th 659. 662.)

Defendant asserts that *People v. Gilbert* (1969) 1 Cal.3d 475 guarantees victory, because there our Supreme Court held that the general theft statute in the Penal Code must yield under the *Williamson* rule to Welfare and Institutions Code section 11482. (See *People v. Murphy*, *supra*, 52 Cal.4th at p. 90 ["in *People v. Gilbert* . . . we concluded that a special statute dealing with welfare fraud precluded prosecution for theft under the general theft statute"].) This may once have been true, but it no longer is.

The basis for the *Williamson* rule is a presumption of legislative intent. And as is the case with most presumptions, it may be rebutted. This explains caveats of "some indication of legislative intent to the contrary," and " 'the entire context' of the statutes at issue." (See *People v. Murphy*, *supra*, 52

13

Cal.4th at pp. 86, 91)  Another exception was formulated in these terms: *People v. Gilbert* "stand[s] for the proposition that when the Legislature has enacted a specific statute addressing a specific matter, and has prescribed a sanction therefor, the People may not prosecute under a general statute that covers the same conduct, but which prescribes a more severe penalty, *unless a legislative intent to permit such alternative prosecution clearly appears*." (*Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1250, italics added, original italics omitted.)

For the reasons that follow, we conclude that defendant's *Williamson* argument cannot be accepted.

Although Welfare and Institutions Code section 11482 obviously has a smaller scope than section 484, nevertheless it is somewhat anomalous to characterize it as a "specific" statute because it covers a multitude of situations, specifically:  (1) making a false statement or representation in an attempt to obtain aid; (2) omitting a material fact in an attempt to obtain aid; (3) making a false statement or representation in an attempt to continue to receive aid; (4) omitting a material fact in an attempt to continue to obtain aid; and (5) doing any of (1) through (4) in order to increase the amount of aid beyond that to which the person "is legally entitled."  In one sense, the theft statute may be the more specific in that it has an element that Welfare and Institutions Code section 11482 does not:  mere efforts or attempts are not sufficient; there must be an actual or constructive transfer of possession.

Another reason Welfare and Institutions Code section 11482 does not meet the usual *Williamson* formula is that it, like its adjacent statutes (see fn. 3, *ante*), refers to another statute concerning prosecution, namely Welfare and Institutions Code section 10980.

14

Welfare and Institutions Code section 10980 commences Chapter 9, and is the sole statute in that chapter, which is entitled "Penalties." (See Stats. 1984, ch. 1448, § 2.) Subdivision (a) virtually restates Welfare and Institutions Code section 11482, differing only in that possible misdemeanor punishments are specified.[4] Subdivision (b) does the same for Welfare and Institutions Code section 11482.5 as a felony.[5] Subdivision (c) specifies the punishment for "any person [who] has, willfully and knowingly, with the intent to deceive, by means of false statement or presentation, or by failing to disclose a material fact, or by impersonation or other fraudulent device, obtained or retained aid . . . for himself . . . not in fact entitled thereto": if the "total amount of the aid obtained or retained is [$950] or less," it is punished

---

[4] "Any person who, willfully and knowingly, with the intent to deceive, makes a false statement or representation or knowingly fails to disclose a material fact in order to obtain aid under the provisions of this division or who, knowing he or she is not entitled thereto, attempts to obtain aid or to continue to receive aid to which he or she is not entitled, or to receive a larger amount than that to which he or she is legally entitled, is guilty of a misdemeanor, punishable by imprisonment in a county jail for a period of not more than six months, by a fine of not more than five hundred dollars ($500), or by both imprisonment and fine." (Welf. & Inst. Code, § 10980, subd. (a).)

[5] "Any person who knowingly makes more than one application for aid under the provisions of this division with the intent of establishing multiple entitlements for any person for the same period or who makes an application for that aid for a fictitious or nonexistent person or by claiming a false identity for any person is guilty of a felony, punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of 16 months, two years, or three years, by a fine of not more than five thousand dollars ($5,000), or by both that imprisonment and fine; or by imprisonment in a county jail for a period of not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both imprisonment and fine." (Welf. & Inst. Code, § 10980, subd. (b).)

as a misdemeanor; if more than $950, as a wobbler felony.[6]  Subdivisions (d) and (e) address misuse in connection with "the federal Supplemental Nutrition Assistance Program," with violations of subdivision (d) being a wobbler felony, and subdivision (e) being declared forgery.  Subdivision (f) and (g) are the same for misuse of CalFresh benefits.  A violation of subdivision (f) is "embezzlement of public funds," while a violation of subdivision (g) is to be punished in the same manner as spelled out in subdivision (c).  Subdivision (h)(1) enumerates enhanced punishment for violations of subdivision (f) or (g) when "committed by means of an electronic transfer of benefits," depending upon the amount taken.

Clearly, Welfare and Institutions Code sections 11482 and 10980 are in pari materia and must be considered together.  (E.g., *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1091 ["Two ' "[s]tatutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person[s or] things, and have the same purpose or object" ' "].)

At first reading, one might be tempted to conclude that Welfare and Institutions Code section 11482 applies only to the *application* for aid or benefits.  But then there are the words "or to continue to *receive* aid to which he or she is not entitled" (italics added).  However, Welfare and Institutions Code section 10980, subdivision (c), which applies to persons who "by means of false statement or representation, . . . or by impersonation," clearly is a

---

[6]  "If the total amount of the aid obtained or retained is more than nine hundred fifty dollars ($950), by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of 16 months, two years, or three years, by a fine of not more than five thousand dollars ($5,000), or by both that imprisonment and fine; or by imprisonment in a county jail for a period of not more than one year, by a fine of not more than one thousand dollars ($1,000), or by both imprisonment and fine."  (Welf. & Inst. Code, § 10980, subd. (c)(2).)

16

description that fits defendant's scheme.  By contrast, as already mentioned, the theft statute is not violated by a simple attempt.  Moreover, section 10980, subdivision (c) incorporates the same figure of $950 to differentiate misdemeanor from felony as is used for the general theft statute.

Thus, although it appears that section 484 cannot be violated without also violating Welfare and Institutions Code section 11482, it is not clear that the latter statute can truly be called the more specific.  The preceding discussion showed that Welfare and Institutions Code section 11482 is not a stand-alone subject, but is part of a comprehensive statutory treatment of the subject of welfare fraud, a scheme not yet enacted when *People v. Gilbert* was decided more than 50 years ago.  " '[T]he entire context' of the statutes at issue" (*People v. Murphy*, *supra*, 52 Cal.4th at p. 91), discloses that that scheme provides for graduated punishments from misdemeanor to felony, parallel to those governing theft in the Penal Code, in the form of Welfare and Institutions Code section 10980.  As the Attorney General notes, defendant's conduct is equally subject to punishment as grand theft or as theft of SSI benefits under the Welfare and Institutions Code as a felony. Defendant's contention that he should be allowed to convert the grand theft charges into seven misdemeanors under the Welfare and Institutions code is simply untenable.  The *Williamson* rule is based on the presumed intent of the Legislature, and there is nothing to suggest such a result was intended, given that there is misdemeanor and felony treatment under Welfare and Institutions Code section 10980 and the theft provisions in the Penal Code. (See *People v. Cockburn* (2003) 109 Cal.App.4th 1151, 1159-1160 [*Williamson* rule does not apply when "competing provisions are a wash" in severity of penalty imposed]; *People v. Lucero* (2019) 41 Cal.App.5th 370, 408-410 [same]; see *Mitchell v. Superior Court*, *supra*, 49 Cal.3d at p. 1250.)

17

## II

Defendant contends, quoting the caption of his brief: "Because all of appellant's grand theft convictions were committed pursuant to a single continuing scheme, those based upon acts committed prior to the Supreme Court's decision in *People v. Whitmer* (2014) 59 Cal.4th 733 [(*Whitmer*)] must be combined into a single grand theft conviction." We agree, in part.

*Whitmer*'s background was explained as follows:

"Defendant, the manager of a motorcycle dealership, arranged for the fraudulent sales of vehicles to fictitious buyers. A jury convicted him of 20 counts of grand theft for 20 separate fraudulent sales. We must decide whether defendant was properly convicted of a separate theft for each vehicle fraudulently sold, or whether he could be convicted of only one count of grand theft because all of the sales were part of a single scheme. Resolution of the issue requires us to revisit language in *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), that some Courts of Appeal have interpreted as permitting only one conviction of grand theft in circumstances like this.

"We conclude that past appellate courts have interpreted *Bailey* more broadly than is warranted. We agree with the Court of Appeal in this case that a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme. We disapprove of Court of Appeal decisions that are inconsistent with this conclusion.

"*However, we also conclude we cannot constitutionally apply this rule to defendant. Under the law that has existed for decades, defendant could only have been convicted of a single count of grand theft. We cannot apply the new rule retroactively to him. Accordingly, and for this reason only, we reverse the judgment of the Court of Appeal, which had affirmed the judgment of*

18

*conviction for the 20 counts of grand theft.*"  (*Whitmer, supra,* 59 Cal.4th at pp. 734–735; italics added.)

Our Supreme Court in *Whitmer* went on to describe the *Bailey* case.  "In *Bailey,* the defendant fraudulently told a welfare office that a man she had been living with had left her home.  Later, and due to this misrepresentation, she received a series of welfare payments that she was not entitled to receive.  She was convicted of one count of grand theft based on her receiving this series of welfare payments.  [Citation.]  Each payment, individually, would have constituted petty theft, but the payments totaled more than $200, which at the time constituted grand theft.  [Citation.]  This court had to decide whether the defendant 'was guilty of grand theft or of a series of petty thefts since it appears that she obtained a number of payments, each less than $200 but aggregating more than that sum.'  [Citation.]  The trial court had 'instructed the jury that if several acts of taking are done pursuant to an initial design to obtain from the owner property having a value exceeding $200, and if the value of the property so taken does exceed $200, there is one crime of grand theft, but that if there is no such initial design, the taking of any property having a value not exceeding $200 is petty theft.'  [Citation.]

"We found the defendant was properly convicted of grand theft. 'Several recent cases involving theft by false pretenses have held that where as part of a single plan a defendant makes false representations and receives various sums from the victim the receipts may be cumulated to constitute but one offense of grand theft.  [Citations.]  The test applied in these cases in determining if there were separate offenses or one offense is whether the evidence discloses one general intent or separate and distinct intents.  The same rule has been followed in larceny and embezzlement cases, and it has been held that where a number of takings, each less than $200 but

aggregating more than that sum, are all motivated by one intention, one general impulse, and one plan, the offense is grand theft.  [Citations.]'

"Particularly relevant to the issue presented here, the *Bailey* court added the following: 'Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are *separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan.*  [Citation.]  In the following cases it was held that each receipt of property obtained by false pretenses constituted a separate offense for which the defendant could be separately charged and convicted.  [Citations.]  Although none of these decisions discussed the rule set forth above, *it does not appear that the convictions would have been affirmed had the evidence established that there was only one intention, one general impulse, and one plan.*'  [Citation.]"  (*Whitmer, supra*, 59 Cal.4th at pp. 736–737, italics added.)

After surveying the subsequent applications of *Bailey* in the Courts of Appeal, the Supreme Court concluded:  "[A] serial thief should not receive a 'felony discount' if the thefts are separate and distinct even if they are similar.  Accordingly, we conclude that a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme.  Without deciding whether any particular post-*Bailey* Court of Appeal opinion was incorrect under its facts, we disapprove of any interpretation of *Bailey* that is inconsistent with this conclusion."  (*Whitmer, supra*, 59 Cal.4th at pp. 740-741.)

20

Yet a thorny question remained. "Defendant argues that principles of stare decisis prevent us from overruling *Bailey*. [Citation.] But we are merely interpreting *Bailey,* not overruling it. To be sure, we are disapproving some post-*Bailey* Court of Appeal decisions. But those cases misinterpreted *Bailey* and overlooked the fact that it cited and distinguished, but did not overrule, earlier cases, including some from this court, that support finding multiple grand thefts in cases like this. We are merely reaffirming those earlier cases . . . ." (*Whitmer, supra,* 59 Cal.4th at p. 741.)

"Defendant also contends we cannot constitutionally apply the rule we adopt to him. Here we agree. 'Courts violate constitutional due process guarantees [citations] when they impose unexpected criminal penalties by construing existing laws in a manner that the accused could not have foreseen at the time of the alleged criminal conduct.' [Citations.] The Attorney General argues that *Bailey* does not prevent applying our interpretation to defendant. We agree. *The problem, however, is not Bailey but the long, uninterrupted series of Court of Appeal cases . . . that have consistently held that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft.* [¶] . . . We do not suggest that any time we resolve a conflict between Court of Appeal decisions in favor of the rule less favorable to the defendant, we may not apply that resolution to that defendant. *But given the numerous, and uncontradicted, Court of Appeal decisions over a long period of time that reached a conclusion contrary to ours, we believe today's holding is also an unforeseeable judicial enlargement of criminal liability for multiple grand thefts. Accordingly, that holding may not be applied to defendant.* [¶] . . . *The law as it had existed for decades before defendant committed his crimes permitted conviction of only one count of grand theft under those circumstances. Because defendant is*

21

*entitled to the benefit of that law he cannot be convicted of more than one count of grand theft."* (*Whitmer, supra*, 59 Cal.4th at p. 742, italics added.)

Defendant thus contends that counts 7, 8, 9, and 10, covering the years 2010, 2011, 2012, and 2013, the years prior to 2014, when *Whitmer* was decided, must be telescoped into a single felony.[7] The Attorney General struggles to preserve the convictions, arguing that "the Supreme Court [in *Whitmer*] noted that *Bailey* discussed but did not overrule a series of cases that concluded that multiple counts of grand theft are proper when thefts resulted from separate and distinct transactions, even though part of a single scheme." "[A]ppellant made distinct, affirmative misrepresentations each year about his income and resources. In light of his affirmative misrepresentations, based on his past year's earnings and resources and projecting his future earnings based on those false statements, appellant was correctly convicted of separate counts of grand theft."

We can only accept the Attorney General's reasoning in part. *Whitmer* must be applied to the thefts that occurred prior to the date it was filed—July 24, 2014. The Attorney General points to a number of Supreme Court decisions prior to *Bailey* (i.e., *People v. Ashley* (1954) 42 Cal.2d 246; *People v. Stanford* (1940) 16 Cal.2d 247; *People v. Rabe* (1927) 202 Cal. 409) that were mentioned in *Whitmer* as "support[ing] finding multiple counts of grand theft" (*Whitmer, supra*, 59 Cal.4th at p. 737), but not specifically overruled. True, *Ashley* and *Rabe* were cited in *Bailey* as supporting the proposition that

---

[7] Logically, count 10, covering 2013, would appear to be within defendant's reasoning, because it too occurred prior to *Whitmer* in 2014. In response to a focus letter we sent counsel in advance of oral argument, defendant's counsel confirmed at oral argument our assumption that the omission of this count and year in his appellate briefing was a simple oversight.

"In the following cases it was held that each receipt of property obtained by false pretenses constituted a separate offense for which the defendant could be separately charged and convicted. [Citations.] Although none of these decisions discussed the rule set forth above[8] it does not appear that the convictions would have been affirmed had the evidence established that there was only one intention, one general impulse, and one plan." (*Bailey*, *supra*, 55 Cal.2d at p. 519.)

However, what appears clear to the Attorney General after *Whitmer* was precisely what was obscured by post-*Bailey* Court of Appeal decisions. Indeed, the reason for deciding *Whitmer* was the Supreme Court's concern that *Bailey* was being improperly interpreted as a departure from the earlier decisions, with the " 'one intention, one general impulse, and one plan' " language being given undue importance. (See *Whitmer*, *supra*, 59 Cal.4th at pp. 737, 740, ["We thus have cases distinguished but not overruled in *Bailey,* . . . that support multiple convictions of grand theft in this case, post-*Bailey* Court of Appeal cases relying on *Bailey* that would prohibit such multiple convictions, and *Bailey* itself. We must decide what the proper rule should be"].) The *Whitmer* court clarified the situation by specifying the correct interpretation and application of *Bailey*, and disapproving those Court of Appeal decisions which diverged from that interpretation. Indeed, as one Court of Appeal noted, it was because "*Whitmer* marked such an abrupt

---

8 "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person *if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan. (People v. Stanford,* [*supra,*] 16 Cal.2d [at pp.] 250-251.)" (*Bailey, supra,* 55 Cal.2d at p. 519, italics added.)

23

departure from the current law that the court held it was not to be applied retroactively." (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1518.)

By contrast, the *Whitmer* court made a point of emphasizing that each of the amounts converted, embezzled, or obtained by false pretense in *Rabe*, *Ashley*, *Stanford*, and the Court of Appeal decisions cited in *Bailey*, was in excess of the amount constituting grand theft. (*Whitmer*, *supra*, 59 Cal.4th at pp. 737-739.) But *Bailey*, as here, dealt with a series of petty thefts. (*Bailey, supra,* 55 Cal.2d at p. 518 ["Although the uncontroverted evidence shows that defendant was guilty of theft by false pretenses, the question is presented whether she was guilty of grand theft or a series of petty thefts since it appears that she obtained a number of payments, each less than $200 [the amount then established for grand theft] but aggregating more than that sum"].) Such is not the case here, and the decisions are thus clearly distinguishable.

If a defendant's wrongful acts are sufficiently "separate and distinct" they may still be treated as separate offenses "even if committed pursuant to a single overarching scheme." (*Whitmer*, *supra*, 59 Cal.4th at p. 741.)[9] The

_____

[9] "In *Bailey*, the defendant committed a single misrepresentation and then received a series of welfare payments due to that misrepresentation. Other than *omitting* to correcting the misrepresentation and accepting the payments, the defendant committed no separate and distinct fraudulent acts. . . . But in this case, and, generally, in the earlier cases the *Bailey* court distinguished, the defendant committed separate and distinct fraudulent acts. [¶] This makes all the difference. When the *Bailey* court said that the earlier cases upholding multiple convictions of grand theft would not have done so 'had the evidence established that there was only one intention, one general impulse, and one plan' [citation], it must have had this distinction in mind. *Bailey* concerned a single fraudulent act followed by a series of payments. The cases *Bailey* distinguished generally

Attorney General is clearly attempting to bring defendant within this language. There is considerable force and logic to the Attorney General's argument that defendant's misrepresentations on his mandatory annual income reports to the Social Security Administration qualify as "separate and distinct fraudulent acts" for the years 2014, 2015, and 2016. But even as separate and distinct offenses, they would still be a series of misdemeanors because, as noted, the monthly amount defendant received from the Social Security Administration never reached $950.[10]

As defense counsel clarified at oral argument, defendant sees no *Bailey-Whitmer* problem with the counts for the years 2015 and 2016 (counts 12 and 13), but he believes "[t]he *Bailey* doctrine . . . should be applied in this case to combine" counts 7, 8, 9, 10 and 11 (covering 2010, 2011, 2012, 2013 and 2014) "into one count of grand theft." But *Whitmer* was decided in July 2014. Whether or not there is sufficient evidence to support a felony charge for the remainder of 2014 is up to the charging authority; on this record we cannot say. (See fn. 7, *ante*.)

On the other hand, defendant implicitly accepts that aggregating the successive petty thefts by year is proper for the remaining counts. We agree. *Bailey* itself involved such aggregation. (Accord, *People v. Packard* (1982) 131 Cal.App.3d 622, 625-626; *Whitmer, supra*, 59 Cal.4th at pp. 744-745 (conc. opn. of Liu, J.).) Once we are past the *Whitmer* period of leniency,

_____

involved separate and distinct, although often similar, fraudulent acts. Accordingly, those cases involved 'separate and distinct' [citation] offenses warranting separate grand theft convictions." (*People v. Whitmer, supra*, 59 Cal.4th at p. 740.)

[10] *Whitmer* involved false pretenses to obtain motorcycles. "The value of the stolen vehicles ranged from $9,100 to over $20,000 per vehicle." (*People v. Whitmer, supra*, 59 Cal.4th at p. 735.)

25

defendant can be convicted of grand theft for the years 2015, and 2016, and perhaps the remainder of 2014. (See *People v. Nilsson* (2015) 242 Cal.App.4th 1, 19 ["The *Bailey* doctrine, as applied by the intervening Court of Appeal decisions, prohibited conviction on multiple counts of grand theft . . . . While the scheme involved multiple acts, it supported only one count of grand theft"].) Together with the one grand theft conviction permitted prior to *Whitmer*, we conclude that defendant could be convicted of no more than four counts of grand theft.

We now address whether the grand theft charges are also vulnerable by reason of instructional error.

### The Theft Instructions

The jury was instructed with CALCRIM Nos. 1800, 1801, and 1802 as follows:

"The defendant is charged in Counts Seven through Thirteen with grand theft as to the Social Security Administration in violation of Penal Code section 487. Each count is for one year, 2010 through 2016.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant took possession of property owned by someone else;

"2. The defendant took the property without the owner's or owner's agent's consent;

"3. When the defendant took the property he intended to deprive the owner of it permanently, and;

"4. The defendant moved the property, even a small distance, and kept it for any period of time, however brief.

"An agent is someone to whom the owner has given complete or partial authority and control over the owner's property.

26

"If you conclude that the defendant committed a theft, you must decide whether the crime was grand theft or petty theft.

"The defendant committed grand theft if the value of the property is more than $950.

"The People have the burden of proving beyond a reasonable doubt that the theft was grand theft rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of grand theft.

"If you conclude that the defendant committed more than one theft within each charged theft offense, you must then decide if the defendant committed multiple petty thefts or a single grand theft. To prove that the defendant is guilty of a single grand theft, the People must prove that: One, the defendant committed theft of property from the same owner or possessor on more than one occasion; Two, the combined value of that property was over $950; and Three, the defendant obtained the property as part of a single, overall plan or objective.

"If you conclude that the People have failed to prove grand theft, any . . . thefts you have found proven are petty thefts."

Based on *People v. Beaver* (2010) 186 Cal.App.4th 107, defendant contends prejudicial instructional error occurred with these instructions because they dealt with theft by *larceny* when his alleged crimes were theft by *false pretense*.

By way of background, common law recognized the offenses of (1) theft by larceny, (2) theft by embezzlement, (3) theft by trick, and (4) theft by false pretense. Section 484, which was enacted in 1872, consolidated these offenses into the single crime of theft. "The purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common law. Indictments and informations charging the crime of

27

'theft' can now simply allege an 'unlawful taking.' [Citations.] Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved. [Citations.] The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses." (*People v. Ashley*, *supra*, 42 Cal.2d at p. 258.) "In other words, the crime is called theft, but to prove its commission, the evidence must establish that the property was stolen by larceny, false pretenses, or embezzlement." (*People v. Gonzalez* (2017) 2 Cal.5th 858, 865-866.)

"The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away. [Citations.] The act of taking personal property from the possession of another is always a trespass unless the owner consents to the taking freely and unconditionally or the taker has a legal right to take the property. [Citation.]" (*People v. Davis* (1998) 19 Cal.4th 301, 305, fns. omitted.)

Our Supreme Court has explained that there are two differences between theft by larceny and theft by false pretense. "[T]heft by false pretenses, unlike larceny, has no requirement of asportation. The offense requires only that '(1) the defendant made a false promise or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' [Citation.]" (*People v. Williams* (2013) 57

Cal.4th 776, 787, italics omitted.) The other difference is "larceny requires a 'trespassory taking,' which is a taking without the property owner's consent . . . . By contrast, theft by false pretenses involves the consensual transfer of possession as well as title of property; therefore, it cannot be committed by trespass." (*Id.* at p. 788, italics omitted.)

There is no dispute that it was error to instruct the jury on theft by larceny, and not instruct on theft by false pretense. The only question is whether the error qualifies as prejudicial.

The Attorney General acknowledges "that since the evidence demonstrated that the *government*, not appellant, moved the money from its bank account into appellant's possession, as a result of appellant's deceit rather than his physical taking, the evidence demonstrated a theft by false pretenses, rather than larceny." He argues that "any error from instructing on larceny was harmless as the evidence of theft by false pretenses was overwhelming and evidence of the elements distinct from those of larceny was introduced and largely undisputed." The Attorney General further acknowledges, as he must, that because the misinstruction involved the elements of the charged offense, reversal is required unless the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Merritt* (2017) 2 Cal.5th 819, 822, 831.)

There is no decisive ruling from our Supreme Court, and there is a split of authority in the Courts of Appeal. The relevant cases are ably canvassed in *People v. Fenderson* (2010) 188 Cal.App.4th 625 (*Fenderson*). To summarize, if the incorrect type of theft submitted to the jury obligated the prosecution to prove an element not required for the correct type, the error is deemed harmless by some courts on the theory that the prosecution actually proved more than it had to. Thus in *Fenderson*, the prosecution's theory of

larceny was more burdensome than the correct theory of embezzlement (see *id.* at pp. 640-641); in *People v. North* (1982) 131 Cal.App.3d 112, *People v. Counts* (1995) 31 Cal.App.4th 785, and *People v. Frederick* (2006) 142 Cal.App.4th 400, it was theft by trick instead of false pretense; and in *People v. Traster* (2003) 111 Cal.App.4th 1377, it was false pretense instead of theft by trick.

The opposing line of cases originates with an opinion Justice Werdegar wrote while a member of Division Three of this District. In *People v. Curtin* (1994) 22 Cal.App.4th 528, the defendant argued there was insufficient evidence to support his conviction of theft by trick. The court agreed: "While a general verdict of guilt may be established on evidence establishing any one of the consolidated theft offenses [citations], *the offense shown by the evidence must be one on which the jury was instructed and thus could have reached its verdict*. [Citation.] Thus, in this case, if the elements of theft by trick were not proven, *the conviction cannot be affirmed on the ground the evidence showed defendant's guilt of false pretenses*, which has additional required substantive elements, as well as a special corroboration requirement, upon which the jury was not instructed . . . ." (*Id.* at p. 531, italics added.)

This thinking was taken up in *People v. Beaver*, *supra*, 186 Cal.App.4th 107. There, like here, the defendant was convicted of theft after the jury was instructed on larceny, but not the correct theory of theft by false pretenses. The Third District, following *Curtin*, concluded this constituted reversible error: "Even if there was sufficient evidence in the record to support the additional elements required for theft by false pretenses, the jury was not instructed on the latter offense and therefore had no occasion to determine if the additional elements had been proved beyond a reasonable doubt." (*Id.* at p. 125.) "In the present matter, we do not have merely a technical error. . . .

30

[E]ven if there was evidence in the record to support these elements, *the jury was never called upon to determine if they had been established beyond a reasonable doubt.*  Under these circumstances, we cannot say the error did not contribute to the guilty verdict." (*Ibid.*, italics added.)

Twenty-three years after she authored *People v. Curtin*, Justice Werdegar was part of a unanimous court in *People v. Vidana* (2016) 1 Cal.5th 632 which made what seems to be a pointed caution.

The issue in *Vidana* was whether grand theft by larceny and embezzlement were separate and distinct offenses.  In the course of deciding that a defendant could not be convicted of both crimes for the same course of conduct, Justice Chin stated:  "We have also held that a jury need not unanimously decide what form of theft a defendant committed.  In *People v. Nor Woods* (1951) 37 Cal.2d 584, . . . the defendant appealed his grand theft conviction.  In an opinion by Justice Traynor, this court rejected his challenge that the information was defective for not identifying the kind of grand theft with which he was charged, concluding it was 'not necessary for the information to allege the particular type of theft involved, such as false pretenses, embezzlement, or larceny by trick and device.' [Citation.]  We further held 'there was no error in failing to instruct the jury that they must agree upon the method by which the theft was committed.' [Citation.]  We reasoned, 'defendant could be found guilty of theft by one means or another, and since by the verdict the jury determined that he did fraudulently appropriate the property, it is immaterial whether or not they agreed as to the technical pigeonhole into which the theft fell.' [Citation.]" (*People v. Vidana, supra*, 1 Cal.5th at p. 643.)

Justice Chin then dropped this footnote:  "Some Courts of Appeal have extended *Nor Wood*[s] and appeared to hold that a theft conviction may be

31

upheld under any theory of theft even if the trial court did not instruct the jury on that theory of theft. [Citing *Fenderson* and *People v. North*.] *This court has never so held.* We need not address this issue here because the jury in this case was instructed on the elements of both larceny and embezzlement." (*People v. Vidana, supra*, 1 Cal.5th at p. 643, fn. 9, italics added.)

And there is this, again from Justice Werdegar, speaking for the Supreme Court just four years ago: " 'Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.' (*McCormick v. United States* (1991) 500 U.S. 257, 270; see *Chiarella v. United States* (1980) 445 U.S. 222, 236 ['we cannot affirm a criminal conviction on the basis of a theory not presented to the jury'].)" (*People v. Pennington* (2017) 3 Cal.5th 786, 800.)

With these Supreme Court cautions very much in mind, we think *People v. Curtin* and *People v. Beaver* state the sounder view. It is one thing to conduct a harmless error analysis when the jury is instructed on the correct charge but an element is omitted. But it is, we believe, quite another to misstate the fundamental identity and nature of the charge. Particularly in light of the line of decisions from the United States Supreme Court declaring an accused's Sixth Amendment right to have a jury decide the existence at trial of any factual issue of any penal consequence (*Apprendi v. New Jersey* (2000) 530 U.S. 466; *Ring v. Arizona* (2002) 536 U.S. 584; *United States v. Booker* (2005) 543 U.S. 220; *Cunningham v. California* (2007) 549 U.S. 270), we are more than a little hesitant to hazard a guess at how the jury would have answered a question it was never asked.

## Substantial Evidence

For defendant, "the evidence is legally insufficient to support [his] grand theft convictions because there is no evidence of asportation nor did appellant commit a trespassory taking." There is no point to examining the merits of whether there is substantial evidence to support a theory of theft that all agree is inapplicable. Without a properly instructed jury, we cannot undertake a substantial evidence analysis. (See *People v. Pennington*, *supra*, 3 Cal.5th at p. 800.) Further, we note that defendant does not claim in this appeal that the evidence is insufficient to support conviction on the correct theory of theft by false pretense.

## The Perjury Conviction

Defendant's second *Williamson* argument is the sole non-sentencing argument directed against his perjury conviction. He contends that he should have been charged with violating only Vehicle Code section 20, a misdemeanor. We do not agree.[11]

The perjury statute under which defendant was convicted provides: "Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states

---

[11] This is another claim that defendant failed to make in the trial court by motion to dismiss, demurrer, or objection. For the same reasons we address defendant's other *Williamson* claim, we will address this one.

as true any material matter which he or she knows to be false, is guilty of perjury." (§ 118, subd. (a).)

Vehicle Code section 20 provides: "It is unlawful to use a false or fictitious name, or to knowingly make any false statement or knowingly conceal any material fact in any document filed with the Department of Motor Vehicles or the Department of the California Highway Patrol."

The perjury charge was alleged to be that defendant on "an application for a California Driver's License, did state as true a material matter which he . . . knew to be false, to wit: answered 'No' to the question of 'Have you applied for a Driver License or Identification Card in California or another state/county using a different name or number within the past ten (10) years?'" License applications are statutorily required to be verified. (Veh. Code, §§ 12800, 2802.) In 1974 a Court of Appeal rejected the argument defendant now makes:

"A false statement in any document filed with the Department of Motor Vehicles may violate Vehicle Code section 20, whereas only a false statement required . . . to be made under oath [citation] or 'under penalty of perjury' may violate Penal Code section 118. [¶] Therefore, Penal Code section 118 does not ' "include the same matter as the special act, and thus conflict with it" ' under *In re Williamson* . . . . Violation of Penal Code section 118 requires an additional element not necessary to violation of Vehicle Code section 20 and therefore *Williamson* does not apply." (*People v. Barrowclough* (1974) 39 Cal.App.3d 50, 55 (*Barrowclough*).) Five years later, Division Three of this District went so far as to characterize a renewal of the argument as "frivolous." (*People v. Jensen* (1979) 94 Cal.App.3d 451, 454 (*Jensen*).)

Defendant characterizes *Barrowclough* as "unsound." Our Supreme Court did subsequently conclude that the *Barrowclough* elements

34

formulation was too narrow, when it added the alternate standard—"when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' " (*People v. Murphy, supra*, 52 Cal.4th at p. 86.) Nevertheless, *Barrowclough* and *Jensen* are still cited as sound. (*People v. Molina* (1992) 5 Cal.App.4th 221, 225-228; cf. *Aslam v. Superior Court* (2019) 41 Cal.App.5th 1029 [acquittal of violating § 115 [offering false or forged instrument for filing] does not preclude prosecution for violating Veh. Code, § 20].)

Without question, the *Barrowclough* court's conclusion about the elements test is still sound, even if no longer exclusive. Nor does the alternate test aid defendant, for a violation of Vehicle Code section 20 will not necessarily or commonly result in a violation of section 118 because the oath or verification requirement, a "more culpable mental state" (*Hudson v. Superior Court, supra*, 7 Cal.App.5th at p. 1007), is still obligatory for conviction of the latter statute.

**Instructional Error**

Defendant presses another instance of claimed instructional error, this one aimed at CALCRIM No. 361, which told the jury: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

According to our Supreme Court, "the instruction applies only when a defendant completely fails to explain or deny incriminating evidence, or

claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge.  The instruction acknowledges to the jury the 'reasonable inferences that may flow from *silence*' when the defendant 'fail[s] to explain or deny evidence against him' and 'the facts are peculiarly within his knowledge.'  [Citation.]  As to incriminating evidence that a testifying defendant denies or explains, there is no silence from which an inference 'may flow.'  [Citation.]  Even if the defendant's testimony conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre, it is not, as the People assert, 'the functional equivalent of no explanation at all.'  On the other hand, those circumstances *do* suggest that the defendant may have 'deliberately lied about something significant,' in which case a court may, as the court did here, instruct jurors to 'consider not believing anything that witness says.' (CALCRIM No. 226.)  Indeed, . . . our cases hold that this instruction . . . is warranted under the very circumstances the People claim warrant instruction on a failure to explain or deny, i.e., when there is a 'material conflict in witnesses' testimony' [citation], when there are 'inconsistencies within the testimony of a single witness' [citation], and when a witness's 'efforts to explain away undisputed circumstances are inherently implausible' [citation].  [Citations.]  These circumstances implicate a testifying defendant's *credibility* as a witness, and thus are properly addressed by an instruction designed to apply 'neutral standards of credibility' to testifying defendants.  [Citation.]  By contrast, the focus of CALCRIM No. 361, as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's failure to explain or deny incriminating evidence in how jurors 'evaluat[e] that evidence,' i.e., the evidence the defendant has failed to explain or deny.  In other words, as we have stated, a

testifying defendant's failure to explain or deny incriminating evidence—'i.e., [a] defendant's silence'—cannot 'be regarded as a confession' and 'does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 117-118, fn. omitted.)

In claiming use of this instruction was prejudicial error, defendant argues he "did not fail to explain or deny any evidence against him which he could reasonably have been expected to deny or explain because of facts within his knowledge. . . . [He] neither completely failed to explain or deny incriminating evidence against him, nor did he claim to lack knowledge of relevant facts or circumstances that he could reasonably have been expected to know." He goes on to state: "This was a close case that could easily have turned out differently if the erroneous instruction had not been given. For the reasons explained in Argument I, *supra*, the evidence supporting the grand theft charges was lacking . . . . Moreover, appellant testified he was not trying to scam SSA and that it was never his intention to steal from them. The perjury charge was also weak. Appellant had absolutely nothing to gain (nor did the prosecutor ever suggest appellant had anything to gain) from 'lying' about whether he had applied for a driver's license or identification card under a different name in the past ten years, while at the DMV applying to add a motorcycle to his license. At the time of the alleged false statement, appellant had already successfully changed the name on his driver's license from Clotfelter to Vail. The only plausible reason why appellant checked 'no' rather than 'yes' is because he thought he was answering the not-so-clear question correctly, as he explained in his testimony."

This extremely abbreviated summary of the evidence against him is not helpful in demonstrating either error or prejudice. In contrast, the Attorney

General devotes the better part of four pages in his brief detailing evidence which would justify the instruction. " 'Instead of a fair and sincere effort to show the trial court was wrong, appellant's brief is a mere challenge to respondents to prove that the court was right. And it is an attempt to place upon the court the burden of discovering without assistance from appellant any weakness in the arguments of the respondent. An appellant is not permitted to evade or shift his responsibility in this manner.' " (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 102.) This merely enforces the most fundamental principles of appellate review—that the judgment or order of a lower court is presumed correct, that error is never assumed, but must be proven by the appellant. (E.g., *People v. Giordano* (2007) 42 Cal.4th 644, 666; *People v. Wiley* (1995) 9 Cal.4th 580, 592, fn. 7; *People v. Douglass* (1893) 100 Cal. 1, 4.)

The record does not establish what particular testimony prompted the prosecution to request this instruction.[12] The record does establish that the point covered by the instruction did not feature in the prosecutor's closing arguments, nor was the instruction specifically referenced. In the absence of a particularized demonstration of how an inference could have been improperly drawn against him under CALCRIM No. 361, defendant has simply failed to overcome the presumption of correctness. Moreover, an effort to demonstrate prejudicial error would almost certainly fall short.

CALCRIM No. 361 only authorizes the jury to draw a permissive inference, the strength of which is left to the jury's discretion. The jury is

---

[12] Appellant concedes that his trial counsel did not object to the instruction. The Attorney General claims that it is forfeited by counsel's failure to assert an objection. We assume, without deciding, that the issue is properly raised under section 1259, and address the merits.

expressly cautioned that this inference "is not enough by itself to prove guilt," and does not lighten the prosecution's burden to prove guilt beyond a reasonable doubt. This was not a case where there was a clear conflict between eyewitnesses. On the contrary, much—if not most—of the prosecution's case was not challenged by the defense, and there was abundant corroborating evidence. Eighteen years ago, addressing the CALJIC predecessor of CALCRIM No. 361, a Court of Appeal stated that "we have not found a single case in which an appellate court found the error to be reversible," and that reviewing courts "have routinely found that the improper giving of [the instruction] constitutes harmless error." (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472.) That state of affairs has continued. Indeed, defendant is unable to cite to a single reported decision where reversible error was found.

## Sentencing Issues

### *Romero* Motion

It was alleged in the information, and found true by the jury, that defendant had three 1989 convictions for committing a lewd or lascivious act upon a child under the age of 14. Prior to sentencing, defendant filed a *Romero* motion asking the trial court to "dismiss the prior convictions alleged pursuant to sections 667 (e)(2)(C)(iv)(1) and 667(b)-(i) in the interests of justice."

The trial court denied defendant's *Romero* motion as follows: "I am declining the defense invitation for the court to exercise its discretion to dismiss the prior conviction allegations. I really see no reason why the court would find that it is in the furtherance of justice to dismiss those strike allegations or the previous convictions for the reasons described by the

prosecution today.[13]  Mr. Clotfelter has been continuously committing crimes when he's been out in the community after he was released from prison and

---

[13]  The prosecutor had stated in opposition to the motion, "Mr. Clotfelter has engaged in criminal activity whenever he's been out of custody. His crimes from the eighties are so long ago [a point made by the defendant for granting relief] because he's been locked up either in a prison or the state hospital for much of his life which has prevented him from committing crimes.  We know when he's out that's what he does.

"In 1995 he was out pretending to be this military officer.  Went around to over 20 schools pretending to be a military officer signing Navy posters. Who can we imagine his target audience is, it's young boys.  And apparently he told one of his doctors that he was on his way to molest another child but was stopped somehow.

"Clearly, though, even without that his actions there in light of his previous history show exactly what he was doing.  He was aiming to befriend. He was aiming to be a leader.  He was aiming to gain these boys' respect and admiration so they would look up to him.  He would be his hero.  His Top Gun hero.  And fortunately he was caught, but that's what he was doing in the brief period that he was out on parole.

"Then he gets declared a sexually violent predator.  He's eventually released, and what does he do?  He starts trying to deceive the community so people won't know he's a sex offender.  And his illegal acts and detention start within a very short time as well.  Whenever he's out of custody or out in an unlocked setting he's out there committing deception and committing crimes along with that deception.  His first deception was deceiving the families and the young boys back in the eighties.  Then he gets out . . . and he's deceiving with the [N]avy story as well as the officers and children at a large number of schools.  Then he gets out again and he's trying to deceive Judge Tisher as well as trying to deceive all the Social Security, and the State Department, and D.M.V.

"He's committing deception from the moment he's out.  So there has been no break in crime.  His only breaks in crime have been when he's incapacitated from committing it.  I don't think there is any reason to strike the strikes in this case particularly given his reason for doing that.  His reason for doing this was so the community wouldn't know who he was.  And his reason for stealing from Social Security is he blamed the state for labeling him as a sex offender.  That's just inconceivable.  I don't see any reason to

40

the state hospital.  Ye[s], it's true they weren't strike convictions, but he has shown just a continuous history of criminality since he committed these strike offenses.  And I see no reason why it would be in the furtherance of justice to strike the strikes."

Although his motion was apparently directed at all three of his prior strike convictions, defendant now contends "the trial court abused its discretion when it refused to dismiss at least two of appellant's 29-year-old prior strike convictions."

In ruling on a *Romero* motion, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [spirit of the three strikes law] scheme[ ] . . . in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)  The three strikes law "establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike unless the sentencing court 'conclud[es] that an exception to the scheme should be made . . . .' " (*People v. Strong* (2001) 87 Cal.App.4th 328, 337-338.)  Consequently, there must be something exceptional about the prior offenses, the current offense, or the defendant's background, character, and prospects, to justify striking a prior serious conviction.

Our Supreme Court has held that "a court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse

---

strike the strikes, and I would ask that the court not strike them, and impose . . . sentence accordingly."

of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)  The court went on to explain just what this means in application:

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.]  Second, a ' "decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra,* 33 Cal.4th at pp. 376-377.)  " '[I]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations.  [Citation.]  Where the record is silent [citation], or '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling even if we might have ruled differently in the first instance' [citation]." (*Id.* at p. 378.)

According to these criteria, we conclude there was no abuse of discretion.  As for "the particulars of his background, character, and prospects" (*People v. Williams, supra,* 17 Cal.4th at p. 161), none of these favors defendant.  Defendant was originally charged with five counts of child molestation; he admitted three, and the remaining counts were dismissed.  Paroled after five years, he violated that parole by impersonating a Navy

fighter pilot, which also saw him convicted for a federal crime and incarcerated in a federal facility. In 2015, he was convicted of failure to keep current his sex offender information (§ 290.012), another felony. Defendant makes no genuine effort to establish that the trial court was incorrect in concluding he has displayed "a continuous history of criminality" since committing the strike offenses.

Instead, his argument anticipates his contention that the aggregate sentence is cruel and unusual. Thus, his "history of criminality is not enough to bring the draconian punishment he received within the bounds of reason." He dismisses his federal conviction "of four counts of false [im]personation [of] a military officer" "shenanigans," without considering that he used the impersonation to get close to children, or that it was an early demonstration of his attempts to deceive.

Finally, defendant characterizes his strike convictions as "remote." A remote prior may be stricken if the record establishes "a crime-free cleansing period of rehabilitation after a defendant has had the opportunity to reflect upon the error of his . . . ways." (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.) However, the trial court accepted the prosecutor's litany of events in defendant's history as showing there has "been no break in crime" except when he was incarcerated or in a state hospital, thus reducing, if not eliminating, any ameliorative impact. (See *People v. Gaston* (1999) 74 Cal.App.4th 310, 321 ["we cannot conclude that appellant led a crime-free life during the period between his . . . strike priors and his current crimes, a factor which would give significance to the remoteness in time of those strikes," citing *Humphrey*].)

Defendant has failed to identify, and to prove beyond doubt, precisely what is exceptional about the prior offenses, the current offenses, or his

background, character, and prospects, that justify striking two prior serious convictions. The total sentence is indeed notable, but defendant has not persuaded us that the only way to reduce was to grant his *Romero* motion. He has failed to establish the trial court's denial of that motion was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra,* 33 Cal.4th at p. 374-377.)

## Section 654

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Defendant contends application of this provision requires that the 25-years-to-life sentences for two of the non-theft offenses be stayed.

The particulars are as follows: In count 3 it was alleged that defendant "did willfully and unlawfully obtain personal identifying information of UNITED PARCEL SERVICES (UPS) and used that information for an unlawful purpose and to obtain, and attempt to obtain credit, goods, services, real property, and medical information without the consent of UPS." Count 4 set forth similar language, with the named victim being Grace Church of Napa Valley.

The operative language of count 5 was that "the crime of FORGERY OF A DOCUMENT . . . was committed by [defendant], who did unlawfully, with intent to defraud, falsely make, alter, forge, and counterfeit a UPS RECEIPT, and did utter publish, pass, and attempt to pass the same as true and genuine, knowing the same to be false, altered, forged, and counterfeited, with the intent to prejudice, damage, and defraud THE U.S. DEPARTMENT OF STATE." In count 6 it was alleged that defendant also forged "a GRACE

44

CHURCH CONTRIBUTIONS STATEMENT," also "with the intent to prejudice, damage, and defraud THE U.S. DEPARTMENT OF STATE."

Defendant presents various theories of how application of section 654 requires reduction of his total sentence.

First, he submits that "The trial court should have applied section 654 to stay execution of sentence on either count 3 or count 5, the two offenses related to UPS." His objective in both instances "was to deceive the Department of State into believing he had actually changed his name . . . so that he could obtain a new consular record of birth abroad (CRBA), and ultimately a new passport." Further, "[h]is unlawful use of UPS's personal identifying information was the means by which he unlawfully obtained the new CRBA and passport from the Department of State. There would be little point in forging the invoice without actually sending it to the Department of State, and sending the fake UPS invoice to the Department of State would have been impossible without the forgery."

Next, defendant makes the same contention as to "either Count 4 or Count 6, the two offenses relating to Grace Church."

Third and last, defendant argues "The trial court should have applied section 654 to stay execution of sentence on either count 3 or count 4, the two identity theft convictions." He reasons that his criminal conduct in both counts "consisted of discrete physical acts, creating the fake UPS receipt, creating the fake Grace Church contribution statement, and sending them both to the Department of State as part of his application for an amended CRBA . . . ."

Defendant does not contend that what he did does not satisfy the statutory definitions of identity theft and forgery. He does not contend that the jury's verdicts on the four counts does not have the support of substantial

45

evidence.  In short, he does not contend his conviction of these counts are invalid or improper.  He simply argues that he should not have been sentenced to a consecutive term of 25 years to life for each of the four offenses.  In this, we conclude, he is correct.

Although issues of section 654's application are not universal, but are fact-specific to each case (e.g., *In re Adams* (1975) 14 Cal.3d 629, 633; *People v. Beamon* (1973) 8 Cal.3d 625, 636), "[w]hen those facts are undisputed—as they are here—the application of section 654 raises a question of law we review de novo." (*People v. Corpening* (2016) 2 Cal.5th 307, 312.)

The two documents were created and submitted for the same purpose—to persuade the Department of State to issue an official document.  Thus, there was an indivisible course of conduct with a single criminal objective (see *Neal v. State of California* (1960) 55 Cal.2d 11, 19) and the identity thefts were merely the means to the ends of perpetrating the forgeries (*id.* at p. 20; accord, *People v. McKinzie* (2012) 54 Cal.4th 1302, 1368; *People v. Harrison* (1989) 48 Cal.3d 321, 335).

Upon remand, the trial court is directed to stay the sentences on counts 3 and 4 pursuant to section 654.

## Cruel and/or Unusual Punishment

Finally, defendant contends his aggregate term of 300 years to life violates the state and federal constitutional prohibitions against cruel and unusual punishment.  The issue could be deemed forfeited by failing to raise it in the trial court.  (E.g., *People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)  Although ordinarily we could consider the merits of the claim " 'in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim' " (*People v. Russell*

(2010) 187 Cal.App.4th 981, 993), there is a compelling reason to consider it premature at best.

More than half of the total sentence, 175 years, is removed from consideration by our determination that none of the 7 theft counts can, at present, be affirmed.  It is possible some of this time may be restored if the People successfully elect to retry him.  We further concluded that application of section 654 requires an additional 50 years to be stayed.  In short, defendant's final aggregate sentence is unknown at this time, making a cruel and/or unusual analysis impossible.

## DISPOSITION

The convictions for perjury, forgery, and identity theft are affirmed.  The theft convictions are reversed.  The aggregate sentence is vacated, and the cause is remanded for resentencing.  Our opinion is without prejudice to any appropriate motion defendant may choose to present at his sentencing.  If the prosecution elects to retry the theft charges, defendant can be tried on no more than four counts in conformity with *Whitmer*.

_____

Miller, J.

WE CONCUR:


_____

Kline, P.J.


_____

Richman, J.


A155134, *People v. Clotfelter*

48